**Donald DVORAK, Appellant,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY; Rockwell International, Appellees.**

**No. 91–2065.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1991.

Decided May 27, 1992.

John M. Heckel, Cedar Rapids, Iowa, argued for appellant.

Alvin Pasternak of New York City, argued (William J. Toppeta, New York City and Thomas P. Luscher, Pittsburgh, Pa., on the brief), for appellees.

Before JOHN R. GIBSON, Circuit Judge, KAUFMAN,* Senior District Judge, and MAGILL, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Donald Dvorak appeals from a judgment denying his claim against Metropolitan Life Insurance Company and Rockwell International for nursing home care his wife Mary Ann received after a period of hospitalization. Rockwell, Dvorak's employer, issued a health and welfare benefit plan underwritten by Metropolitan Life. The Plan provided for convalescent nursing home benefits, but excluded "principally custodial" care. The only issue in the case is whether the magistrate judge, trying the case by consent, erred in ruling that the care Mary Ann Dvorak received was principally custodial. We reverse and remand with directions to enter judgment awarding benefits in the amount of $31,434.

Donald Dvorak was an employee of Rockwell International, Goss Graphics Division, and was insured under a group plan provided under the collective bargaining agreement. The Plan was governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461 (1988). Metropolitan Life Insurance Company was the trustee and fiduciary under the Plan. The Plan provided as follows with respect to nursing home care:

**Convalescent Nursing Home**

If you become confined to an accredited Convalescent Nursing Home benefits will

---

* The HONORABLE FRANK A. KAUFMAN, Senior United States District Judge for the District , of Maryland, sitting by designation.

be paid for the actual charges at the ward or semi-private rate (for private room the charges up to the home's most common semi-private room rate) for room, board and services provided by professional and practical nursing personnel, *excluding custodial and personal type care,* for not more than 730 days for the same or related cause or causes, subject to the following:

. . . .

(2) nursing home care will be covered only if confinement immediately follows prior in-patient hospitalization involving surgery, or if not involving surgery, immediately follows an in-patient hospitalization of at least three days, and is ordered by a physician as necessary for convalescence from an illness or injury, or treatment of a terminal condition or a long-term disability, where nursing home facilities are required *and the care required is not principally custodial. . . .*

(Emphasis added).

Dvorak's wife, Mary Ann, was hospitalized between April 17 and May 3, 1985, and was diagnosed as suffering from Wernicke–Korsakoff Syndrome. She was then transferred to Northbrook Manor Care Center, an intermediate care facility, where she remained until her death. Her attending physician filed a statement with Metropolitan Life in November 1985, stating that she was to receive care in an intermediate care facility and specifying Northbrook as the facility. Mary Ann Dvorak received care at Northbrook beyond the 730 days of convalescent nursing care provided for in the Plan. The magistrate judge succinctly outlined the evidence concerning Mary Ann Dvorak's condition:

Mary Ann Dvorak was placed in a nursing home because she required constant nursing attention. She had to be restrained at all times whether sitting in a chair or laying down. This was due to her uncontrollable body movements. Her head and arms would flail around and the restraint was necessary to prevent her from harming herself.

While at Northbrook, Mrs. Dvorak could not feed herself. Feeding became difficult as she could not hold her own head up by herself. She would open her mouth on command and the employees of Northbrook would hold her head back to prevent her from choking on her food.

When she arrived at Northbrook, a catheter was used to assist the elimination of bodily waste. She was intermittently incontinent in the first six to eight months and then became totally incontinent. The catheter had to be checked, changed and irrigated by qualified nursing personnel. The catheter was ultimately removed in June 1985.

While at Northbrook, nurses administered the antipsychotic drug haldol as necessary. Haldol was administered several times in some months and none in others. Again, qualified nursing personnel were required to determine when haldol should be administered.

She was closely monitored for malnutrition and dehydration and the nurses attended to pressure sores that developed as a result of extensive confinement to her bed.

*Dvorak v. Metropolitan Life Ins. Co.,* No. 87–0202, slip op. at 3–4 (N.D. Iowa Apr. 15, 1991).

Mary Ann Dvorak's physician monitored her level of care on a monthly basis and continued to prescribe "intermediate care" for her. When Dvorak submitted a claim for benefits under the Rockwell Plan, Metropolitan Life initially denied the claim. Metropolitan then had Dr. James Westbay, its associate medical director, review the claim. Dr. Westbay based his review solely upon the nursing notes Northbrook Manor provided him. He did not consult the language of the Plan or any written industry standards in determining whether to grant or deny benefits, nor did he obtain an opinion from Mrs. Dvorak's physician. At the time, Dr. Westbay had no written guidelines for determining whether nursing home care was principally custodial, but he applied certain criteria that Metropolitan Life's medical staff consistently used in reviewing claims. Dr. Westbay considered whether Mrs. Dvorak received either

skilled nursing care or custodial care, and concluded that it was custodial. Therefore, under the Plan's exclusion, Mrs. Dvorak's care was not covered.

Donald Dvorak then brought this action under ERISA to recover the benefits for the cost of his wife's nursing home care, which was stipulated to be $31,434. The parties consented that the case be tried before a magistrate judge pursuant to 28 U.S.C.A. § 636(c) (West Supp.1992). After reciting the facts we have stated above, the magistrate judge held that he was to make a de novo review of the denial of benefits, and stated that the question was simply one of contract interpretation. Slip op. at 8, 10. The judge determined that ERISA did not provide an answer as to how the phrase "primarily custodial care" should be interpreted, and that other decisions under ERISA provided no guidance.[1] *Id.* at 10–11. Looking to dictionary definitions of the common meanings of the terms used in the Plan, the magistrate judge stated: "[T]he ordinary meaning of the phrase 'principally custodial care' appears to be 'the attention given to the safety and well-being of an individual that most importantly or consequently consists of protection, care, maintenance, and tuition.'" *Id.* at 12.

In applying this definition to the facts, the magistrate judge concluded:

> The care that plaintiff's wife received at the Northbrook Manor Nursing Home consisted principally of general overall supervision and assistance with walking, dressing, washing, feeding, and elimination of bodily waste. Although a catheter was used to assist in the elimination of bodily waste and the antipsychotic drug haldol was administered periodically when necessary, these measures,

when considered in light of the other assistance she was receiving, do not change the principally custodial nature of her care.

*Id.* at 12–13. Accordingly, the magistrate judge affirmed the denial of Dvorak's claimed benefits. *Id.* at 13.

On appeal, Dvorak argues that the magistrate judge erroneously denied his claim for benefits by misinterpreting the Plan's phrase "principally custodial care." Metropolitan Life and Rockwell argue that the magistrate judge did not clearly err in finding that Mrs. Dvorak's care was principally custodial and hence, excluded from the Plan's coverage.

Dvorak contends that "custodial care" is a term of art with specialized meaning within the convalescent nursing home care industry. He points out that nursing home accreditation is classified by statute into three types of facilities: skilled, intermediate, and custodial. *See, e.g.,* 42 U.S.C.A. § 1395i–3 (West Supp.1991) (skilled); 42 U.S.C. § 1396d(c) (1988) (intermediate); 42 U.S.C. § 1395y(a)(9) (1988) (custodial). While there is no statutory definition of "custodial care," section 1396d(c) of Title 42 defines an intermediate care facility as a state-licensed institution that provides, "on a regular basis, health-related care and services to individuals who do not require the degree of care and treatment which a hospital or a skilled nursing facility is designed to provide, but who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities....."[2] Dvorak argues that the Plan excluded only custodial care level nursing homes, but tacitly approved facilities providing skilled and

---

**1.** The magistrate judge cited *Cathey v. Dow Chemical Co. Medical Care Program,* 907 F.2d 554, 556 (5th Cir.1990), *cert. denied,* ── U.S. ──, 111 S.Ct. 964, 112 L.Ed.2d 1051 (1991), and *Offutt v. Prudential Insurance Co. of America,* 735 F.2d 948, 949 (5th Cir.1984). The plan in *Cathey* contained a definition of "custodial care," but the coverage at issue involved home health care, rather than nursing home benefits. 907 F.2d at 556. *See also O'Connor v. Central Virginia U.F.C.W.,* 945 F.2d 799, 800 (4th Cir. 1991) (although plan at issue defined "custodial

care," the benefits related to home health care). In *Offutt,* the term "custodial care" was not at issue. 735 F.2d at 949.

**2.** The latest version of 42 U.S.C. § 1396d(c) no longer contains this definition of intermediate care facility, but now contains the phrase "nursing facility," which is defined at 42 U.S.C.A. § 1396r(a) (West Supp.1991). The 1988 version of section 1396d(c) was in effect when this lawsuit arose.

intermediate care. Because his wife received care in an accredited intermediate facility, Dvorak argues that it was reasonable for him to assume that the Plan covered his wife's costs.

Dvorak also stresses that the Plan, in discussing approved facilities for convalescent and long-term illness care, refers to Title I of Public Law 89–97, the Medicare Act. *See* 42 U.S.C. § 1305 (1988) (Historical Note, Short Title of 1965 Amendment). The Plan also states that benefits are available for confinement in a nursing home which "qualifies as an Extended Care Facility under Medicare." Dvorak argues that the magistrate judge should have considered Pub.L. No. 89–97, since it involves nursing home accreditation and classifies facilities into the three types named above.

While the parties have provided little help in directing us to the relevant portions of Pub.L. No. 89–97, which is more than 150 pages long, there is no question that when this lawsuit arose, the law referred to three categories of nursing facilities. The Plan's failure to define custodial care, coupled with its references to Pub.L. No. 89–97 and the Medicare Act, perhaps make it desirable for us to formulate a definition of custodial care, but we are not convinced that the scope of our review requires, or for that matter, entitles us to do so. In view of our conclusion that the magistrate judge made a clearly erroneous determination using his own definition of "custodial care," we will simply assume without deciding that he articulated a reasonable definition of that phrase.

■ Dvorak argues alternatively that the Plan's failure to define the term custodial care is a per se violation of ERISA disclosure requirements. ERISA requires that the Plan description and Summary Plan Description contain information of "the plan's requirements respecting eligibility for participation and benefits ... [and] circumstances which may result in

disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b) (1988). It is disturbing that Metropolitan Life had its own definition of custodial care, as evidenced by Dr. Westbay's testimony, and that the definition appeared nowhere in the Plan. We are troubled with the Plan's failure to define custodial care and, indeed, this may violate ERISA. In view of our determination that the magistrate's finding that Mrs. Dvorak received custodial care was clearly erroneous, however, we need not reach this issue.

In making his determination, the magistrate judge applied a de novo standard of review, finding that "[t]he Rockwell plan does not give Metropolitan the requisite discretionary power that would require this court to review the fiduciary's actions under the arbitrary and capricious standard." Slip op. at 9. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (denial of benefits should be given de novo review unless benefit plan gives administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe terms of plan). While Metropolitan Life argues that it should prevail even under the magistrate judge's de novo standard of review, it claims that there is sufficient language in the Plan indicating that the reviewing court should give deference to the provider's decision to deny benefits. We conclude, however, that the magistrate judge correctly determined that there was no language in the Plan giving Metropolitan Life such discretion as to warrant an arbitrary and capricious standard of review.[3] Metropolitan Life also cites a Fifth Circuit case, *Pierre v. Connecticut General Life Insurance Co.*, 932 F.2d 1552, 1558–59 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991), which held that a review of a fiduciary's factual determinations, such as what is at issue here, need not be given de novo re-

---

3. Section 11 of the Plan states that "[d]etermination by the Insurance Company as to whether or not an institution is an 'Approved Facility for Convalescent and Long–Term Illness Care' shall be conclusive." This is not sufficient language to confer upon Metropolitan Life the required

discretion with respect to the issue before us. Further, Metropolitan Life and Rockwell admit that there is "no dispute that Northbrook is a properly accredited institution for *covered services* provided to a plan participant." Appellees' Br. at 14–15 (emphasis in original).

view, because a fiduciary has "inherent" discretionary authority to make determinations regarding claims. The essence of Metropolitan's argument, however, is that the magistrate judge's decision that Mrs. Dvorak was receiving custodial care should be reviewed under the clearly erroneous standard, and we simply accept Metropolitan's invitation to review the case on that basis.

■ As we have stated earlier, the magistrate judge formulated his own definition of the phrase "principally custodial care," defining it as " 'the attention given to the safety and well-being of an individual that most importantly or consequently consists of protection, care, maintenance, and tuition.' " Op. at 607. As we have said, we will assume without deciding that this definition is correct. When we do so, we are left with the definite and firm conclusion that the magistrate judge's finding that the services provided to Mary Ann Dvorak were principally custodial care is clearly erroneous. The standard of review for factual findings is provided by Fed.R.Civ.P. 52 and explained and expanded upon in *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). *Anderson* teaches that when testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it," we may find clear error. *Id.* at 575, 105 S.Ct. at 1512.

We do not have a situation where the magistrate judge's determination is based on the conflicting testimony of two or more witnesses. The shortcoming of the magistrate judge's finding that Mrs. Dvorak had principally custodial care is that such a finding is internally inconsistent with the other facts he found, rendering the determination implausible on its face. Mary Ann Dvorak required constant nursing attention. She had to be restrained at all times, whether sitting in a chair or lying down, because of her uncontrollable body movements and because her head and arms would flail around so that she had to be prevented from harming herself. She could not feed herself or hold her head up by herself. The employees had to hold her head to prevent her from choking on her food. A catheter was in place during the first few weeks of her stay at Northbrook, and Mary Ann Dvorak eventually became totally incontinent. Nurses administered the antipsychotic drug Haldol and were required to determine when to administer the drug. Nurses closely monitored Mrs. Dvorak for malnutrition and dehydration, and attended to her pressure sores. In light of the factfinding he made, the magistrate judge clearly erred in determining that the care Mary Ann Dvorak received was principally custodial in nature.

We reverse the judgment the magistrate judge entered in the district court and direct that judgment be entered in behalf of Dvorak in the full amount sought for the expenditures for convalescent care during the covered period.