CAMELOT CARE CENTERS,
INC., Plaintiff,

v.

PLANTERS LIFESAVERS COMPANY,
et al., Defendants.

No. 92 C 1671.

United States District Court,
N.D. Illinois, E.D.

Nov. 2, 1993.

Tobin Richter, for plaintiff.

Stephen M. Naughton, for Nestle.

David Americus, for Planters.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Camelot Care Centers, Inc. ("Camelot") has sued Planters Lifesavers Company ("Planters"), Nabisco Brands, Inc. Hourly Employee Benefit Plan ("Plan") and Nestle Food Company, Inc. ("Nestle"), as assignee of benefits due to a Planters employee under the Plan. Planters and Plan have now filed a joint motion for summary judgment, Camelot has responded with a summary judgment motion of its own, and Nabisco has joined in its codefendants' motion and in their resistance to Camelot's motion. For the reasons stated in this memorandum opinion and order, Camelot's motion is granted and all defendants' motions are denied.

### Summary Judgment Principles

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions.

As the later discussion will indicate, the need for such a dual perspective does preclude a summary judgment in either di-

rection on certain of the grounds placed at issue by the parties, because there are indeed material fact issues in dispute relevant to those grounds. That not only obviates the need to set out the disputed facts bearing on those grounds, but it also renders unnecessary this Court's entry into any analysis of the not-always-consistent Seventh Circuit decisions in the area. Accordingly what follows in the next section is limited to a statement of the facts that are relevant to the self-contained issue on which Camelot unquestionably prevails.

### Facts

When this dispute was triggered in early 1990, M.R.[1] worked for Planters, a division of Nabisco Brands, Inc. ("Nabisco") that maintained a facility in Franklin Park, Illinois. M.R. was covered by the Plan, an employee health benefit plan administered for Nabisco by Prudential Insurance Company of America ("Prudential"). Nabisco had issued a Summary Plan Description ("SPD") effective September 1, 1987 to outline the terms and conditions of the Plan. That SPD remained in effect throughout the relevant time period.

In February 1990 M.R.'s daughter C.R., who was a covered dependent under the terms of the Plan, began suffering from major depression, borderline personality disorder and socialized nonaggressive conduct disorder. After a diagnosis by Camelot's Medical Director Dr. Albert Lang, C.R. was admitted by Camelot on February 12, 1990. On that same day M.R. assigned to Camelot all rights to employee benefits afforded by the Plan.

On February 23, 1990 Nabisco sold the assets of the Franklin Park facility to Nestle. All the terms of the Plan remained in effect, but Nestle replaced Prudential as Plan administrator with its own insurer, Aetna Insurance ("Aetna"). Shortly after the sale to Nestle and the change in Plan administrators, Prudential paid an amount under the Plan attributable to the first four days of C.R.'s stay at Camelot (a period that had preceded the sale and changeover). Mean-

while C.R. had been receiving continuous therapy, and Camelot asked the Plan to continue to cover those costs. That request was denied on the stated grounds that Camelot is not a "hospital" as defined by the Plan because it assertedly furnishes "primarily custodial or domiciliary care"—an express exclusion from the Plan's definition of "hospital."

It is undisputed that the Plan includes, within its major medical expense benefit coverage, "Hospital Room and Board" and "Other Hospital Services" (Plan at 10–11). Plan at 13 goes on to state:

### MENTAL, PSYCHONEUROTIC AND PERSONALITY DISORDERS

In the case of mental, psychoneurotic and personality disorders, the Plan covers services received during a hospital confinement resulting in a room and board charge.

As one of the exclusions from its major medical expense coverage, Plan at 15 lists:

6. Services received in connection with a mental, psychoneurotic or personality disorder while not confined in a hospital.

Finally, in its section setting out "DEFINITIONS FOR THE PURPOSE OF THE PLAN," Plan at 21 reads:

Hospital—A legally operated institution which meets either of these tests:

1. Is accredited as a hospital under the Hospital Accreditation Program of the Joint Commission on the Accreditation of Hospitals, or

2. Is supervised by a staff of doctors, has 24–hour–a–day nursing service and is primarily engaged in providing either:

a. General inpatient medical care and treatment through medical, diagnostic and major surgical facilities on its premises or under its control, or

b. Specialized inpatient medical care and treatment through medical and diagnostic facilities (including X-ray and laboratory) on its premises, or under its control, or through a written agreement with a hospital (which itself qualifies un-

---

1. In accordance with a previously-issued protective order, the Plan beneficiary and her daughter are referred to as "M.R." and "C.R."

der 1 or 2 of this definition) or with a specialized provider of these facilities. In no event will the term "hospital" include a nursing home or an institution or part of one which (a) is primarily a facility for convalescence, nursing, rest, or the aged, or (b) furnishes primarily domiciliary or custodial care, including training in daily living routines, or (c) is operated primarily as a school.

Camelot states, and none of the defendants disputes, that no copy of the Plan itself was furnished to M.R. as a participant. Instead, as is typical in connection with employee benefit plans provided by large employers, she was given an SPD booklet. Here are the relevant portions of the SPD (at pages 4 and 8–9 (boldface type in original)):

**Basic Hospital Expense Benefit**

**Hospital Room and Board,** If you or a covered dependent requires hospitalization, coverage for up to 120 days is provided for the cost of semi-private room, meals and general nursing service.

> \* \* \* \* \* \*

**Mental Illness**

If you or your dependents incur covered medical expenses while confined in a hospital for mental illness or functional nervous disorder, the same benefits will be payable as provided for any other disability.

**No benefits will be paid for mental illness or functional nervous disorder when not confined to a hospital.**

**Expenses Not Covered**

Medical expenses that are not covered include:

> \* \* \* \* \* \*

● charges for custodial care.

Though the Plan sets out the earlier-quoted definition of "hospital," no definition of that term is included in the SPD. And nei-

ther the Plan nor the SPD attempts to define the phrase "primarily custodial or domiciliary care" that is included in the Plan's definition of "hospital." Camelot's facilities, and the parties' respective contentions as to how they fit or do not fit within the Plan's coverage, will be discussed in the section of this opinion dealing with the legal issues involved.

After Camelot's principal claim for payment had been rejected, it brought suit (pursuant to the assignment of M.R.'s rights) against Planters, the Plan and Nestle. It seeks $93,154.90 for unreimbursed medical treatment furnished to C.R., plus prejudgment interest and attorneys' fees. Although the parties have formed battle lines on other fronts as well, this case proves to be capable of disposition on the ground that Camelot is indeed a "hospital" for Plan purposes, so that the denial of coverage is actionable under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1145.[2] That issue will be dealt with first, to be followed by a very brief discussion of other matters.

### Camelot As a "Hospital"

█ Although Camelot is clearly not the conventional self-contained type of hospital *that can seek and obtain accreditation as such* (alternative 1 in the Plan's definition of the term),[3] Camelot demonstrates—and defendants do not controvert—that it meets the requirements of alternative 2.b except for one disputed fact. It *is* "supervised by a staff of doctors," it *does* have "24–hour–a–day nursing service" and it *is* "engaged in providing ... [s]pecialized inpatient medical care and treatment through medical and diagnostic facilities (including X-ray and laboratory)"—some of those "on its premises" and the others "through [ ] written agreement[s] with [ ] hospital[s] ... or with [ ] specialized provider[s] of those services." Nor do defendants quarrel with Camelot's clear showing that it is not a nursing home.

---

2. Citations to ERISA will take the form "Section—," referring to the Title 29 numbering rather than ERISA's internal numbering.

3. D.R. Mem. 8–10 try to make much of the facts that Camelot is not licensed or accredited as a "hospital" and that it does not describe itself as such in its advertising literature. Both of those

contentions are really red herrings—an effort to divert attention from the fact that the Plan itself specifies as an alternative an equally acceptable type of "hospital" that does *not* have to meet *accreditation standards or fit the more tradition-al mode.*

Where the parties do part company is over the issue whether the just-referred-to "medical care and treatment" represent Camelot's primary activity, as definition 2.b requires. Instead defendants' opening gun [4] contended (1) that Camelot is not a "hospital" as defined in the Plan because it "furnishes primarily domiciliary or custodial care" and (2) that Camelot cannot invoke the other theories advanced in its Complaint to permit it to recover in this action. Camelot has met the argument as to the meaning of the Plan head-on, as well as attempting some glancing blows to attack the denial of benefits by the Plan.

Because the dispositive claim is one under Section 1132(a)(1)(B)—an action to enforce rights or recover benefits due under the terms of the Plan—a word should first be said as to the appropriate standard of review of the Plan administrator's refusal to pay. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108–15, 109 S.Ct. 948, 953–56, 103 L.Ed.2d 80 (1989) teaches that absent an express grant of discretionary authority to the administrator, "denials of benefits based on plan interpretations" (*id.* at 108, 109 S.Ct. at 953) are to be reviewed de novo rather than under an "arbitrary and capricious" standard. Camelot says, and defendants do not dispute, that the Plan contains no such discretionary grant—nor has this Court's inspection uncovered any. Thus de novo review it is.

In performing that review, this Court declines Camelot's invitation to look in the first instance to the meaning of "hospital" as developed by the common law, on the theory that SPD employs that word without defining it and that M.R. (and hence Camelot) can rely on the SPD to the exclusion of the Plan. In that respect, see, e.g., this Court's decision in *Senkier v. Hartford Life & Accident Ins. Co.*, No. 90 C 3488, 1991 WL 44293 at *3, 1991 U.S.Dist. LEXIS 3671, at *7–9 (N.D.Ill. Mar. 25) and its affirmance at 948 F.2d 1050, 1051 (7th Cir.1991). There may be one limited respect in which the SPD does cabin the Plan somewhat, but more of that

later. To begin with, then, this Court looks to the Plan itself.

In that respect, however, the Plan *fails* to define what is meant by "furnish[ing] primarily domiciliary or custodial care." That failure is itself problematic—as stated in *Dvorak v. Metropolitan Life Ins. Co.*, 965 F.2d 606, 609 (8th Cir.1992):

> We are troubled with the Plan's failure to define custodial care and, indeed, this may violate ERISA [disclosure requirements under Section 1022(b)].

But quite apart from that, this Court is perforce driven to examine sources outside of the four corners of the Plan. It has therefore obeyed the command that insurance plans governed by ERISA are to be interpreted by the standards of the federal common law (*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987)). To that end it has turned to analogous federal statutes employing the undefined terms (surely a promising source in a search for the federal common law, though the litigants have not explored it) as well as to the general common law (in the latter respect see, e.g., *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir. 1990) (federal common law "must embody common-sense canons of contract interpretation," adopting the best-reasoned of those from state law)). Those sources as well as past usage by Aetna itself all compel the conclusion as a matter of law that Camelot does not fall within the scope of the exception to Plan coverage.

One last preliminary point before this opinion turns to the detailed explanation of that conclusion: To the extent that the language left undefined by the Plan may be said to create ambiguities, the *contra proferentem* doctrine of document construction dictates that such ambiguities are to be construed against the insurer as the Plan's drafter (*Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 311–14 (7th Cir.1992)). *Granite*

---

4. As stated at the outset, Planters and the Plan originally launched the summary judgment efforts, while Nestle's two filings have been limited to two pages each—one joining in the original motion, the other joining in its codefendants' final memorandum. This opinion will accordingly treat defendants collectively.

*State Ins. Co. v. Degerlia,* 925 F.2d 189, 191–92 (7th Cir.1991) (citations omitted) explains:

> On one end of the spectrum we place that policy language that is clearly and unambiguously in favor of coverage. At the other end of the spectrum we place that policy language that clearly and unambiguously excludes coverage. If the relevant language in the Granite State policy falls at either end of that spectrum—i.e., if it is subject to only one reasonable interpretation—then we apply the terms of the policy as written. If the relevant language in the Granite State policy is ambiguous and falls between the two ends of the spectrum—i.e., if it is subject to more than one reasonable interpretation, at least one of which would favor coverage—then we construe the policy strictly against its drafter, the insurer.

Justification for the *contra proferentem* rule is the "need to protect an insured from an insurer who has had exclusive control of the drafting process" and the "take-it-or-leave-it" nature of the insurance relationship in which "the insured has no voice" *(Phillips,* 978 F.2d at 313, quoting a leading treatise).[5] In sum, the assignment of meaning to the express terms of the Plan will be guided by the principle that any ambiguity will be construed against Prudential and Planters (and Nestle as Planters' successor).

### Does Camelot "Furnish[ ] Primarily ... Custodial Care"?

As for one of the Plan's undefined exclusions, that relating to institutions that furnish "primarily custodial care," several federal statutes and regulations give form to that otherwise amorphous concept. For instance, the Dependents' Medical Care Act ("CHAMPUS," codified as amended at 10 U.S.C. §§ 1071–1106), a federally-subsidized health care program for dependents of active duty military personnel, covers hospitalization but excludes services characterized as "custodial care" (10 U.S.C. § 1077(b)(1)).[6] Regulations promulgated to define the latter term describe it as (32 C.F.R. § 199.2(b) (1992)[7]):

> *Custodial care.* Care rendered to a patient:
>
> (i) who is disabled mentally or physically and such disability is expected to continue and be prolonged, and
>
> (ii) who requires a protected, monitored, or controlled environment whether in an institution or in the home, and
>
> (iii) who requires assistance to support the essentials of daily living, and

---

**5.** Defendants would have it that the Plan "was collectively bargained for," so that the doctrine should not apply (D.R. Mem. 12 n. 10). At least two answers occur to this Court:

  1. Defendants offer no *evidence* in that respect, and summary judgment principles reject the notion that a party's legal memoranda may create such factual issues.

  2. Even if it were true that the Plan's definitions were the product of input that was provided by anyone other than the insurer (something that would be extraordinary indeed), an insured participant such as M.R. (in whose shoes Camelot stands) surely had no role—"no voice"—in the process. As between such an insured and the insurer, the doctrine must apply with full vigor.

It is scarcely surprising that all 50 states as well as the District of Columbia adhere to the *contra proferentem* doctrine "and with good reason" (*Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 540 (9th Cir.1990)). As *Masella v. Blue Cross & Blue Shield of Conn., Inc.,* 936 F.2d 98, 107 (2d Cir.1991) put it, quoting *Firestone Tire,* 489 U.S. at 110–11, 109 S.Ct. at 954–55:

  [W]e believe that application of this rule of interpretation to de novo review of ERISA insurance plans is an appropriate implementation of the congressional expectation that the courts will develop a "federal common law of rights and obligations under ERISA-regulated plans."

**6.** As the discussion in the next section of this opinion reflects, CHAMPUS also excludes "domiciliary care" from its hospitalization coverage. Thus CHAMPUS provides a striking parallel to the Plan: Each covers hospitalization costs, each excepts "custodial care" or "domiciliary care" from that coverage, and each refers to those exclusions without expressly defining them. And so the CHAMPUS regulations that flesh out the undefined terms are powerfully informative as to their common-sense (and hence common-law) meanings. Yet as indicated earlier, neither litigant called that parallel or those regulations to this Court's attention. Instead it took the perceptive independent research of this Court's law clerk, Jon Loevy, to uncover that valuable source of insight to the problem.

**7.** Further citations to the CHAMPUS regulations will simply take the form "Code § —," omitting the 32 C.F.R. reference.

(iv) who is not under active or specific medical, surgical, or psychiatric treatment that will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored, or controlled environment.

Treatment furnished by Camelot to C.R. (and to its other patients) plainly does not fit that mold. It is phrased in the conjunctive, and although the first two factors arguably describe C.R., the latter two do not—especially the fourth one. As to the third factor, while C.R. did receive some help in that area, she did not require the type of assistance to make it through the day that appears to be contemplated by the term "custodial care."[8] And as for the fourth factor, the uncontroverted evidence plainly demonstrates that therapy and treatment are Camelot's primary goals,[9] and it is equally beyond dispute that the institutional purpose of Camelot's facility is indeed to reduce future levels of care. Those things squarely exempt it from the definition. This conclusion is all at one with the official note to the "custodial care" definition in Code § 199.2(b) that specifies that a "program of physical and mental rehabilitation which is designed to reduce a disability is not custodial care as long as the objective of the program is a reduced level of care."

Camelot thus does not fit within the exclusion for "custodial care" as defined by CHAMPUS. That plain reading is bolstered by the regulatory examples of potential custodial care cases Code § 199.4(e)(12)(i):

Examples of potential custodial care cases may be a spinal cord injury resulting in extensive paralysis, a severe cerebral vascular accident, multiple sclerosis in its latter stages, or presenile and senile demen-

tia. These conditions do not result necessarily in custodial care but are indicative of the types of conditions that sometimes do.

Of course C.R.'s treatment did not even begin to approach that type of care. Although she did receive some assistance designed to aid her in daily living functions in Camelot's "homelike setting" (D. Mem.Ex.D), she simply did not require the level of care and oversight that mark "custodial care" as defined by CHAMPUS.

That same conclusion is called for by the Medicare statute, Title XVIII of the Social Security Act (42 U.S.C. §§ 1395–1395ccc), which bans coverage of non-hospice "custodial care" without specifically defining that term (42 U.S.C. § 1395y(a)(9)). As *Hayner v. Weinberger*, 382 F.Supp. 762, 766 (E.D.N.Y.1974) summarizes the then-existing judicial rulings construing that statute:

While the term "custodial care" is not defined in the Act, it has been interpreted to connote a level of routine maintenance or supportive care which need not be provided in an institutional setting by skilled professional personnel.

To the same effect, the accompanying regulations define the term in terms of "administering routine medication, routine care of incontinence, assistance in dressing, eating and going to the toilet, and exercise supervision not done by a physical therapist" (*Kuebler v. Secretary of United States Dep't of Health & Human Services*, 579 F.Supp. 1436, 1438 (E.D.N.Y.1984), describing former Section 42 C.F.R. § 405.127(d)). Or as *Barnett v. Weinberger*, 818 F.2d 953, 968 (D.C.Cir.1987) (quoting *Kuebler* and citing *Hayner*) summarizes the matter:

8. *See Adelson v. GTE Corp.*, 790 F.Supp. 1265, 1271 (D.Md.1992), a very similar case where the psychologically-troubled daughter of an insured employee sought coverage for her treatment at the "Chestnut Lodge" under a policy that also excluded but did not define "custodial care." *Adelson, id.* arrived at essentially the same definition as this Court by reviewing the "common sense meaning" and how "numerous other courts have interpreted it." In concluding that the therapy and care provided by the facility was not primarily custodial, *Adelson* was particularly convinced by the fact that the daughter (like

C.R.) did not really require assistance to complete the essentials of daily living.

9. As Camelot's literature states, "[t]he services offered by Camelot form a continuum of care which is heavily weighted towards reducing the necessity or length of inpatient stays" (D.Mem. Ex. D). Indeed, defendants' own Statement of Facts ¶ 13 (emphasis added) says that "Camelot Care Centers is a residential *treatment* facility which provides residential psychiatric *treatment....*"

[C]ourts almost uniformly have interpreted as descriptive of this type of care that which "can be provided by a lay person without special skills and not requiring or entailing the continued attention of trained or skilled personnel."

It is clear that the care provided by Camelot transcends the boundaries of mere custodial care. Camelot is a treatment-oriented institution staffed with skilled professionals who, although they do not all have medical degrees, are not at all accurately characterized as lay people. Crucially, the mere fact that Camelot provides some extent of "routine" care [10] is not sufficient to render the entire mission "custodial"—as *Barnett*, 818 F.2d at 969 & n. 135 puts it:

> To suggest that a victim of a catastrophic illness or a severe accident is receiving "custodial care" simply because the "primary" portion of her attendants' time is spent providing for her elemental needs is patently misguided.[135] The critical factor is not the division or percentage of the labor daily received by the patient but the essential nature of the patient's call for supervision and ministration, even if considerably less frequent, from medical professionals.

---

[135] Indeed, further extension of the perverse logic advanced by the Department would reveal that the more debilitating the ailment affecting a claimant, the more likely the care will be termed "custodial," since even the simplest bodily tasks will require assistance and supervision.

Thus defendants are wholly unpersuasive in arguing that Camelot's care is custodial because it provides, among other things, assistance in daily living.

This opinion's conclusion that Camelot's care was not custodial is further underscored by Aetna's own definition in comparable policies. For example, Aetna's policy involved in *Erickson v. Aetna Life Ins. Co.,* 777 F.Supp. 1463, 1467 (D.Minn.1991) defined "custodial care" as "care that is provided primarily to assist the individual in the activities of daily living," such as "eating, dressing, grooming, voiding, and moving the extremities to main-

---

**10.** D.Mem. 7 points out that Camelot's literature speaks of training in daily living such as personal care, grooming, health and hygiene; cooking;

tain muscle condition." Similarly, Aetna's policy at issue in *Glocker v. W.R. Grace & Co.,* 974 F.2d 540, 543 (4th Cir.1992) clarified that care is not "custodial" when it "must be combined with other necessary therapeutic services and supplies.... to establish a program of medical treatment which can reasonably be expected to contribute substantially to the improvement of the individual's medical condition," or if it involves a program of medical treatment "which can reasonably be expected to substantially improve the individual's medical condition." To be sure, those cases deal with different policies—but they so closely comport with the definitions already discussed that it ill behooves Aetna (whose entry onto the scene coincided with the turndown of coverage for Camelot) to urge that an alternative unconventional conception of "custodial care" should govern this insurance relationship.

In sum, the undefined and ambiguous term "primarily ... custodial care" must be read Camelot's way under the circumstances. As a matter of law, Camelot's therapy and treatment of C.R. cannot be characterized as "primarily custodial care."

### Does Camelot "Furnish[ ] Primarily Domiciliary ... Care"?

As for "domiciliary care," the other undefined exception to the "hospital" category, it is worth noting at the outset that this is the one respect in which the SPD *is* at odds with the Plan itself. Although the latter specifies a dual exception to the definition of "hospital"—"primarily domiciliary or custodial care"—the SPD states the exception *only* in terms of the latter and says *nothing* about the former:

**Expenses Not Covered**

Medical expenses that are not covered include:

\* \* \* \* \* \*

Charges for custodial care.

That difference could reasonably be viewed in two ways, each of which would compel a ruling adverse to defendants. It could re-

serving and cleaning up after meals; household chores; attending school; and "other organizational skills" (see D.Mem. Exs. B & C).

flect the view of the SPD's drafters (binding on defendants) that "custodial" and "domiciliary" are essentially synonymous terms—that is one of the common ways in which the word "or" is used to couple two other words. On that reading the just-completed analysis in the preceding section of this opinion also calls for the conclusion that Camelot is not "primarily domiciliary" either. On the other hand, if the terms were *not* to be considered essentially as synonyms, the express difference between the SPD and the Plan may trigger application of the doctrine that when an SPD and the employee benefit plan that it describes are in conflict, the former document controls (see, e.g., *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981–82 (5th Cir. 1991) and cases cited there). Again that doctrine would lead Camelot to prevail over defendants without further discussion.

But defendants lose on the issue even apart from what has just been said. At the risk of "gild[ing] refined gold [or] paint[ing] the lily," [11] this opinion will go on to examine the issue on its own.

In contrast to "custodial care," much less case law has developed around the phrase "domiciliary care." That has led both sides to invoke standard dictionary definitions. Defendants, for example, cite the Oxford English Dictionary to urge that the term is synonymous with "residential" because "domicile" and "residence" are like concepts. Camelot counters by pointing to the "domiciliary *care*" usage in Webster's (unlike Camelot's reference to an abridged version, this Court will quote the definitive unabridged Webster's *Third New International Dictionary* 671 (1986)):

d: providing, constituting, or provided by a rest home for chronically ill or permanently disabled war veterans requiring minimal medical attention < ~ care available> <state ~ facilities>.

Camelot clearly has the better of the argument in those terms. Defendants' emphasis on the similarity between "domiciliary" and "residential" really glosses over the fact that what is at issue is the primary nature of the *care* provided by the institution. If the mere

presence of residential features could render an institution "primarily domiciliary," then the Plan would exclude, for example, patients housed in Northwestern Memorial Hospital for an extended period because they require constant monitoring. Any such restrictive reading would be at war with the Plan's stated coverage of expenses for hospital stays including "room and board and regular daily services and supplies" (Plan at 10).

Once again CHAMPUS provides meaningful enlightenment. Like the Plan, it too expressly excludes coverage for "domiciliary care" (10 U.S.C. § 1077(b)(1)) without defining the term.[12] And here is what Code § 199.2(b) of the accompanying regulations says on that score:

*Domiciliary care.* Inpatient institutional care provided the beneficiary not because it is medically necessary but because the care in the home setting is not available, is unsuitable, or members of the patient's family are unwilling to provide care. Institutionalization because of abandonment constitutes domiciliary care.

Then Code § 199.4(e)(13)(i) goes on to provide:

The following are examples of domiciliary care for which CHAMPUS benefits are not payable:

(A) *Home care is not available.* Institutionalization primarily because parents work, or extension of a hospital stay beyond what is medically necessary because the patient lives alone, are examples of domiciliary care provided because there is no other family member or other person available in the home.

(B) *Home care is not suitable.* Institutionalization of a child because a parent (or parents) is an alcoholic who is not responsible enough to care for the child, or because someone in the home has a contagious disease, are examples of domiciliary

11. William Shakespeare, *King John*, act 4, sc. 2, line 11.

12. As stated in n. 6, the CHAMPUS provision (which has been in effect since 1966) is directly mirrored (copied?) by the Plan's exclusionary language—CHAMPUS contains the identical pairing of terms, excluding "[d]omiciliary or custodial care."

care being provided because he home setting is unsuitable.

(C) *Family unwilling to care for a person in the home.* A child who is difficult to manage may be placed in an institution, not because institutional care is medically necessary, but because the family does not want to handle him or her in the home. Such institutionalization would represent domiciliary care, that is, the family being unwilling to assume responsibility for the child.[13]

In that light the care furnished by Camelot is not primarily domiciliary for several reasons. First, the fact that C.R.'s care was "medically necessary" is attested to by Dr. Rodrigo L. Farrales' "letter of medical necessity."[14] Second, the examples provided by the CHAMPUS regulations describe a type of plight wholly distinguishable from C.R.'s: She was placed with Camelot, not at all because her parent or parents were unavailable or unwilling to provide for her (quite the contrary), but rather because they were unable to provide the type of care that she needed to receive. But perhaps the most conclusive evidence that Camelot's care is not of the prohibited domiciliary variety is the fact that Camelot is an approved facility for insurance coverage under the CHAMPUS program (Ryals Aff. ¶ 12). In other words, insurance provided by the United States government that expressly excludes domiciliary (and custodial) care from coverage nonetheless *accepts* the services rendered by Camelot.

In sum, from whatever perspective the question is approached, Camelot is not primarily engaged in furnishing "domiciliary care." And even were that in doubt (as it is not), Camelot can again call to its aid the principle of *contra proferentem*. That principle applies here with even greater force than for the "custodial care" discussion, because there are fewer external clues or insights as to what was intended.

*Summary*

Because the Plan language defining a hospital is ambiguous in failing to define two key exclusions of imprecise content, and because all of the analysis supports Camelot's position rather than defendants' (with or without the benefit of the *contra proferentem* doctrine), Camelot must prevail. As a private institution Camelot was free to refuse any patient not covered by insurance, and C.R. was admitted because Camelot reasonably read the Plan as encompassing its treatment (indeed, as explained a bit later in this opinion, it took all reasonable steps required to verify that reading *before* it admitted C.R.). Defendants cannot now be permitted to take advantage of the ambiguity in their own Plan to deny coverage. As taught by our Court of Appeals in *Phillips*, 978 F.2d at 314 (citation omitted):

> Insurance policies are almost always drafted by insurers, and they should be certain that limitations in their coverage are clear enough for a lay person to understand. Insurers should not be permitted to exploit policy term ambiguities, which they could have avoided, to deny coverage to an unsuspecting insured. We hold that the Plan's mental illness limitation does not apply to [the participant's] condition, and therefore [affirm summary judgment in favor of the insured].

■ Hence Camelot is entitled to prevail on its motion for summary judgment on that score alone. But one added matter must be addressed in that respect: defendants' contention that even if Camelot wins on that issue, its motion for summary judgment is nevertheless actually only a motion for *partial* summary judgment because "any determination by this Court in favor of plaintiff would not end this litigation against defendants" (D.R.Mem. 2). As defendants would have it, the denial in their Answer encom-

---

**13.** [Footnote by this Court] See also 38 C.F.R. § 17.30(n)(1992):

The term *domiciliary care* means the furnishing of a home to veteran, embracing the furnishing of shelter, food, clothing and other comforts of home, including necessary medical services.

**14.** Dr. Farrales wrote that C.R. "seems to respond only when there is strict structure provided to her, almost around the clock," and he concludes that "she is not ready to go home" (D.Mem. Ex. C).

passes, "*inter alia,* that C.R.'s care was not medically necessary" (*id.*)

There are at least four reasons to reject that contention in the context of the current cross-motions:

1. Rule 56(e) expressly precludes defendants' attempt to rely on their Answers, unsupported by any evidentiary showing, as the basis for resisting summary judgment:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

2. In any case, nothing in the Answers or Affirmative Defenses adverts to the asserted absence of medical necessity for C.R.'s case—it is simply not enough to file general denials, which is all that defendants did in their Answers, and each defendant's Affirmative Defenses have nothing to do with challenges to the medical necessity for C.R.'s care.

3. Defendants' assertion is essentially inconsistent with the basic notion of summary judgment as succinctly expressed in *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.,* 762 F.2d 557, 559 (7th Cir.1985), citing to the same effect this Court's opinion in *Keene Corp. v. International Fidelity Ins. Co.,* 561 F.Supp. 656, 666 (N.D.Ill.1982), *aff'd and adopted,* 736 F.2d 388, 393 (7th Cir.1984):

> Where no material factual issues are present, a summary judgment proceeding is the functional equivalent of a new trial; under such circumstances a full-scale trial is neither necessary nor helpful.

As this Court said in *Santella v. Grishaber,* 654 F.Supp. 428, 436–37 (N.D.Ill.1987) (citations omitted), citing *Publishers Resource:*

Summary judgment is intended to be a substitute for trial or, more accurately, a determination no evidentiary trial is necessary because material factual disputes are absent. If a party goes to trial and loses, there is no opportunity for a second trial to advance evidence or issues that could have been but were not put forth at trial. And so it has become well established that the *opponent* of a Rule 56 motion cannot "hold back" evidence—if the motion is lost, there is no second chance.

4. Perhaps most damning, because each defendant's initial rejection of Camelot's claim and each defendant's pleadings asserted only the reasons for denial that have been dealt with in this opinion, the established doctrine that forbids a defendant to "mend its hold" forecloses recourse to the belated new ground (see the discussions in *Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 362–63 (7th Cir.1990), and in the seminal Illinois decision in *Larson v. Johnson,* 1 Ill.App.2d 36, 116 N.E.2d 187 (1st Dist.1953)).[15]

In short, defendants' belated effort to sandbag Camelot with their afterthought argument sans evidence will not work. This opinion's already-stated conclusion that Camelot is entitled to collect its claimed damages as a matter of law will stand.

### *Other Issues (or Nonissues)*

Camelot also advances some other arguments to support its entitlement to reimbursement. But because each of them involves contested factual issues, thus automatically precluding summary judgment in either direction because of the dual perspective demanded on such cross-motions, this Court need not enter the tangled thicket of equitable estoppel in ERISA cases (compare *Black v. TIC Investment Corp.,* 900 F.2d 112, 114–15 (7th Cir.1990), *Pohl v. National Benefits Consultants, Inc.,* 956 F.2d 126, 127 (7th Cir.1992), *Vershaw v. Northwestern Nat'l Life Ins. Co.,* 979 F.2d 557, 559 (7th Cir. 1992), *Russo v. Health, Welfare & Pension*

---

**15.** This Court has had numerous occasions both before (see, e.g., *Shacket v. Roger Smith Aircraft Sales, Inc.,* 651 F.Supp. 675, 695 (N.D.Ill.1986)) and after (see, e.g., *Scherer v. Rockwell Int'l Corp.,* 766 F.Supp. 593, 600 n. 7 (N.D.Ill.1991)) *Harbor Ins.* to refer to and apply that doctrine.

*Fund,* 984 F.2d 762, 767 (7th Cir.1993) and *Kraut v. Wisconsin Laborers Health Fund,* 992 F.2d 113, 117 (7th Cir.1993)).[16] Nor is there any call under the circumstances to explore any of the complexities of ERISA preemption. It is after all unnecessary for a plaintiff to prove its right to damages on more than one theory—it can recover those damages only once in any event.

## Conclusion

There is no genuine issue of material fact as to the coverage of the claimed expenses by the Plan, and Camelot is entitled to a judgment as a matter of law. Although each of Planters and Nestle had asserted an affirmative defense seeking to point the finger at the other as to when the breach in Plan performance occurred, once again neither has provided *evidence* to support its position—and pleading alone does not do the job under Rule 56(e).

In terms of the evidentiary record, the Plan nonperformance straddled the time of the Nestle takeover—and Planters and Nestle have chosen to present a common front in resisting Camelot's motion as well as in support of their own. Judgment is ordered to be entered jointly and severally against all three defendants in the sum of $93,154.90 plus prejudgment interest, and so long as Camelot receives payment defendants may sort out the matter of ultimate liability among themselves.[17]

---

16. It must be said, though, that *Vershaw* (though one of the cases that upholds the availability of equitable estoppel in ERISA cases) would cause Camelot serious difficulties in advancing its argument along those lines here.

17. This Court has not been provided with the necessary information to enable it to deal with Camelot's prayer for an award of attorneys' fees. That question remains for future determination as soon as Camelot tenders it, but the existence of the open question does not detract from the finality of the judgment ordered here (*Budinich v. Becton–Dickinson & Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)). It would be constructive if counsel for the parties were to confer in advance of Camelot's filing in an effort to narrow (if not to eliminate entirely) the issues involved in the fee determination.