**FARLEY, INC., Appellant–
Cross–Appellee,**

v.

**Peter A. CHIAPPETTA, Appellee–
Cross–Appellant.**

No. 93 C 3267.

United States District Court,
N.D. Illinois, E.D.

Feb. 1, 1994.

Bonita Stone, Chicago, IL, for Farley, Inc.

Paul Slater, Chicago, IL, for Peter A. Chiappetta.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Both Farley, Inc. ("Debtor") and Peter Chiappetta ("Chiappetta") have appealed from the Findings of Fact and Conclusions of Law Concerning the Claim of Peter Chiappetta, 1993 WL 120498 (1993 Bankr. LEXIS 550 (Bankr.N.D.Ill. April 2))[1] entered by Bankruptcy Judge Jack Schmetterer in Debtor's bankruptcy proceedings (*In re Farley, Inc.*, 91 B 15610, 1993 WL 120498). Despite those cross-appeals and the extensiveness of those Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"), some matters that have not been fully dealt with below preclude either the outright affirmance or a reversal of Judge Schmetterer's decision in the respects challenged by the parties—instead the matter is remanded for further consideration.

### Standards of Review

This Court considers Judge Schmetterer's Conclusions de novo, while his Findings may be overturned only if clearly erroneous (*Dacon Bolingbrook Assoc. Ltd. Partnership v. Federal Nat'l Mortgage Assoc.*, 155 B.R. 467, 470 (N.D.Ill.1993), reflecting the mandate of Bankr.Rule 8013). As to matters that partake of both factual and legal components, *In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986) teaches:

> This case involves a mixed question of fact and law.... The factual determinations are subject to the clearly erroneous standard; but the manner in which these factual conclusions implicate the legal definition ... is subject to a *de novo* review.

1. In referring to the decision below, this opinion will hereafter omit the LEXIS citation, simply referring instead to "Finding—" or "Conclusion—."

### Factual Background [2]

Debtor is a Delaware corporation controlled by William Farley ("Farley"), who owns 76.3% of its stock. Debtor is just one among a cluster of corporations run by Farley—in part it comprises manufacturing and sales divisions (e.g., a Tool & Engineering division that manufactures automobile parts), and in part it holds securities in its diversified investment portfolio (e.g., shares of Fruit of the Loom, Inc.) (Finding 1). Another member of the corporate family is Farley Industries, Inc. ("Industries"), an Illinois corporation wholly owned by Farley [3] that provides management, investment and other advisory services to Debtor and other entities controlled by Farley (Finding 2). Farley is the Chief Executive Officer of both companies (Finding 3).

During the first half of 1988 Debtor borrowed $500 million to provide capital for a leveraged buyout. Industries' designated role was to manage the fund and coordinate the acquisition (Finding 4), and to that end Farley searched for a merger specialist to handle the intended acquisition. Chiappetta, a veteran of well over 100 such acquisitions (Chiappetta Tr. 297 [4]), was a clearly attractive candidate for the position. His background included experience at E.F. Hutton as its Senior Vice–President, Mergers and Acquisitions, Merchant Bank. Now he was serving as managing director of the Merchant Banking Group of Shearson, Lehman, Inc. (Finding 5), where his total annual compensation for the prior calendar year had been $1 million (Jt. at 3, part of Chiappetta's summary statement but not disputed by Debtor).

During three or four meetings Chiappetta and Farley discussed an employment position with Industries entailing responsibility for identifying an attractive target and negotiating its acquisition. Farley eventually offered and Chiappetta accepted the position of Executive Vice President–Corporate Development for Farley Industries (Finding 7). Their negotiations over the terms and length of the employment contract were unassisted by counsel (though Farley was a law school graduate).

Chiappetta, who was leaving his $1 million salary for an Industries' package worth no more than $325,000 ($225,000 salary and $100,000 bonus) in guaranteed money, required—and Farley agreed—that a portion of Chiappetta's compensation package include shares of any corporation that he assisted Debtor in acquiring (termed "Newco" by the parties) (Finding 5).[5] Farley directed Kenneth Greenbaum ("Greenbaum"), general counsel for both Debtor and Industries, to reduce the oral understanding to writing (Finding 9). Greenbaum prepared a letter agreement reciting the agreed terms, and it was signed by Farley and Chiappetta on May 2, 1988 [6] (Chiappetta Ex. 1 [7]).

This briefly summarizes Finding 8's description of the arrangement set out in the Agreement:

**2.** What follows in this section suffices for an understanding of much of the analysis in this opinion. To the extent that other aspects of the record must come into play to decide the issues, they will be set out during the later substantive discussion.

**3.** Industries is a Subchapter S corporation, so that for federal income tax purposes it is the equivalent of a sole proprietorship.

**4.** This is the manner in which this opinion will cite the trial transcript, referring first to the name of the witness and then to the transcript page number. Citations to the parties' Joint Pretrial Statement will simply take the form "Jt. ¶—."

**5.** Chiappetta later testified that he "would not have considered the position" with Farley without the opportunity to obtain equity in Newco (Chiappetta Tr. 166).

**6.** Finding 9 contains a typographical error, stating that the Agreement was signed on May 2, 1993.

**7.** Within a few months thereafter (on August 4, 1988) the arrangement between the parties was modified to include compensation for Chiappetta's new responsibilities concerning management of Debtor's stock portfolio. For that duty he was also to receive 2% of the "Net Portfolio Profit"— a percentage of the profits generated by the portfolio he administered. That provision is not a component of the current dispute. But because the amended version of the parties' agreement (Chiappetta Ex. 3) supplanted the earlier document, this opinion will refer to the later and not to the earlier version as the "Agreement."

—Chiappetta's employment would begin on May 3, 1988 and end on May 2, 1993.

—His annual base compensation was to be $225,000 plus a minimum first year bonus of $100,000.

—He would also receive as added compensation 10% to 14% of the fees received by Industries in connection with any acquisition in which he participated.

—In addition he was entitled to receive 3 to 4% of "Farley Inc. and its affiliates' common equity interest in Newco."

—He would report directly to Farley.[8]

And here is precisely what the Agreement specified as to Chiappetta's participation in Newco:

> You will also receive a percentage of Farley Inc. and its affiliates' common equity interest in Newco. This percentage shall be not less than 3 percent nor more than 4 percent.... Your equity interest will vest in three equal annual installments commencing with the closing of the transaction [with exceptions not relevant here]. If prior to any vesting date set forth above you voluntarily terminate your employment with Farley Industries, then vesting shall cease as of such date of termination. Should your employment terminate for any other reason (except for cause) then vesting shall take place as provided above [with an exception not relevant here].

Chiappetta began his work for Industries on a hostile tender offer to acquire West Point–Pepperell, Inc. ("West Point"), a large producer-marketer of branded textile products for the household fabrics market (Finding 19 n. 1). Spearheading the leveraged buyout was West Point Acquisition Corporation ("WPAC"), one of Debtor's wholly-owned subsidiaries, and financing was to be obtained by bank loans coupled with the sale of what Debtor refers to as "high-yield debt instruments" (Debtor Mem. 11) and Finding 32 describes as "junk bonds." For purposes of the takeover bid, WPAC needed well over $1.5 billion.[9]

In October 1988 two of WPAC's wholly-owned subsidiaries (West Point Tender Corporation and West Point Subsidiary Corporation) purchased 95% of West Point–Pepperell's outstanding stock (Greenbaum Tr. 505–07), and the deal closed in April 1989. Both sides recognize that Chiappetta took the required part—in the language of the Agreement, "participated in"—the negotiations that produced the transaction (Jt. ¶ 26). Because Debtor's plan was to acquire 100% of the outstanding shares, Finding 36 states:

> Neither party here had intended that the tender offer would be the end point of the deal. [Debtor's] plan was to purchase 100% of the outstanding West Point shares. Then, it would sell off various divisions, and apply the proceeds to retire the debt and redeem WPAC preferred stock.

But as it turned out, the deal was doomed to fail. When the market for the WPAC bonds collapsed, financing for the deal fell through and WPAC eventually filed a petition for Chapter 11 reorganization in the Bankruptcy Court in the Southern District of New York (*In re West Point Acquisition Corp.*, No. 92 B 43233 (CB)). WPAC emerged from that reorganization under the new name Valley Fashions, Inc. ("Valley Fashions") when its plan was confirmed on September 4, 1992 (Greenbaum Tr. 604). Under the plan all WPAC stock was cancelled and the banks, the bondholders and Debtor were left to fight it out in negotiating for the equity. As Chiappetta's Mem. 21 in response to Debtor's appeal explains, this was the outcome under the plan:

> [Valley Fashions'] Class A common was issued to the banks and bondholders who received 28.5 million shares of Class A stock. Farley, Inc. and its management team received all of the 1.5 million shares of Class B (i.e., 5% of the total 30 million shares of common) which was issued.

---

8. Finding 8 says that "meant that Chiappetta would serve as the number two executive concerning both [Debtor's] and Industries' activities related to merger and acquisition objectives."

9. According to Greenbaum Tr. 505–06, the right-hand side of the balance sheet reflected $700 million in increasing-rate paper notes, about $800 million in bank debt and $200 million in increasing-rate preferred stock.

(Green. 579–83, 597; Ch. Ex. 14, p. 2). The Class B common has preferred voting rights and the holders of the Class B stock are guaranteed that they can elect three of the nine members of the Valley Fashions Board of Directors. (Green. Tr. 583; Ch. Ex. 15A, Ex. A, p. 2–6, 8).

Out of the 1.5 million shares of Class B which issued, Farley, Inc. received 75,000. Richard Cion [10] personally received another 120,000 shares of Class B and Bill Farley personally received 705,000 Class B shares. (Green. Tr. 590, 597–98, 605–06). The balance was received by other officers of Farley, Inc. and West Point. (Green. Tr. 599–600, 610).

In sum, following the WPAC reorganization Debtor itself emerged with just 5% of WPAC's Class B common [11]—but it exercised its control over the other 95% by allocating it to individual insiders (including 47% to Farley himself!). And none of those individuals paid any money for their stock—all of it stemmed from WPAC's pre-reorganization holdings.

Meanwhile the relationship between Farley and Chiappetta had begun to sour as the WPAC transaction unfolded. First a quarrel arose over the amount due Chiappetta for his entitlement to 2% of Debtor's Net Portfolio Profit under the Agreement. Different methods of accounting led Chiappetta to claim that Debtor owed him about $1.2 million while Farley put the figure substantially lower. Further strains on the relationship evidenced themselves in connection with the WPAC venture. Citing his qualms about Chiappetta's negotiating ability (Finding 48), Farley (acting on behalf of Industries) re-hired Cion as "Executive Vice President–Corporation Development of [Industries]" to assume leadership for the takeover (Finding 49). Cion, who had been Chiappetta's predecessor in that position with Industries, had

then been employed at Drexel Burnham Lambert, the lead investment banker involved in financing the WPAC deal.

After Cion's return to Industries, Chiappetta was swiftly "stripped of his responsibilities." Soon he "was left with virtually nothing to do" (Finding 50; Chiappetta Tr. 246–48), and his appeals to Farley to modify the situation went unheeded. Chiappetta was told to work out his problems with Cion, to whom he was now directed to report (instead of directly to Farley as before) (*id.* at 245). Soon thereafter Chiappetta and Industries parted company. As Finding 51 summarized:

Thus, when Cion was retained as the new "Executive Vice President–Corporate Development," Chiappetta was demoted. He went from being number two at Industries to being a subordinate to the number two executive. The reason for this demotion was apparently the lack of confidence in Chiappetta's negotiating style. However, his employment was not terminated for this reason. Rather, the occasion for his departure was the failure of Cion and Mr. Farley to find meaningful work for Chiappetta in his new position as subordinate to Cion.

Farley met with Chiappetta in early March 1990 to discuss a severance agreement to govern Chiappetta's imminent departure (Finding 52; Chiappetta Tr. 269–72; Farley Tr. 794–804). Chiappetta recounted that he proposed that his salary be continued until he found a new job or the employment contract expired on May 2, 1993 (whichever came first), and that "his entitlement to 3% of the interest of Farley, Inc. and any affiliate in 'Newco' would vest immediately upon the termination of his employment" (Finding 52). For his part Farley strongly maintains that those terms were never accepted by him.[12] In any event, Chiappetta cleaned out

---

10. [Footnote by this Court] This opinion later discusses the part played by Richard Cion ("Cion") in the controversy between the parties.

11. Of those shares, Debtor received 100 shares of Valley Fashions common in return for its 10,000 common shares of WPAC and the other 74,900 shares in exchange for Debtor's original holding of WPAC preferred stock.

12. Farley testified that he made handwritten notes within a few days after the meeting to set down the severance terms as he understood them. Those notes were then turned over to Industries' chief financial officer Paul O'Hara ("O'Hara") to transcribe. According to Farley, the notes indicate that Chiappetta's salary and benefits would cease as of June 30, 1993.

his office soon thereafter and left Industries forever.

It would become clear afterwards that the two men held divergent views as to what if anything was agreed upon at this March 1990 meeting. They were later able to reach an accord on a few of the issues in dispute,[13] but for the most part the terms that were (or were not) struck at that meeting remain hotly contested.

Chiappetta testified that in June 1990, after he learned from a phone conversation with O'Hara that Industries planned to terminate his salary and benefits on June 30 (a conversation about which O'Hara testified he has no recollection (O'Hara Tr. 939)), Chiappetta called Farley and demanded that there be no interruption. Farley agreed to continue Chiappetta's entitlements through August but warned that there would be no other extensions. When August arrived, O'Hara called Chiappetta and told him that Farley had ordered him to cut off payments at the end of the month.

In mid-October 1990 Chiappetta's attorney wrote Industries, charging it with breach of the Agreement and demanding the salary, benefits and equity participation that Chiappetta felt were due him. That letter did not mention the parties' severance agreement. In any case, Industries did not respond.

On November 15, 1991 Chiappetta filed a proof of claim in Debtor's bankruptcy proceedings, alternatively asserting breaches of the Agreement and the claimed severance agreement and seeking to recover (1) salary and benefits dating from September 1, 1990 through April 30, 1993, (2) his share of Net Portfolio Profit and (3) 3% of the common stock holdings in WPAC/Valley Fashions

Corp.[14] After Debtor had filed and the Bankruptcy Court had denied a motion for summary judgment (*In re Farley, Inc.,* 1992 WL 332294, 1992 Bankr. LEXIS 1801 (Bankr.N.D.Ill. Nov. 10), Judge Schmetterer conducted an extended trial (covering nearly 1,000 transcript pages). On April 2, 1993 he issued his Findings and Conclusions, denying Chiappetta all relief except to the extent that Debtor was directed to deliver to him 2,250 of its common shares of Valley Fashions stock on the basis that those shares were held in a constructive trust for Chiappetta. Debtor's appeal and Chiappetta's cross-appeal followed.[15]

### Issues on Appeal

Debtor takes issue with the concept of the 2,250–share constructive trust on several grounds. First Debtor questions the Bankruptcy Court's decision to pierce its corporate veil. Another string to its bow is its argument that Chiappetta voluntarily terminated his employment with Industries in March 1990, when he left and thereafter performed no further work for the company, rather than his being fired on August 31 as the Bankruptcy Court concluded. While Debtor acknowledges that Chiappetta would be entitled under the Agreement to 1% of the WPAC equity (whatever amount that might be) that had indisputably vested before his March departure, Debtor argues that the Bankruptcy Court erred when it granted "prospective vesting rights" for the other two 1% interests that were not due to vest until April 1990 and April 1991 respectively. Other issues that Debtor raises on appeal include Judge Schmetterer's decision to look to the allegedly abandoned or rescinded Agreement in the first place, and the question

---

**13.** For example, on the issue of Net Portfolio Profit the parties eventually struck a compromise ($850,000 paid in installments), so that aspect of the relationship is not at issue here (Finding 61). Farley also agreed on behalf of Industries to allow Chiappetta's continued use of his company car as part of the severance (Farley Tr. 816; Chiappetta Tr. 272–73).

**14.** After Chiappetta had once amended his claim on April 13, 1992, he filed a Second Amended Claim on August 24, 1992, stating at Paragraph 44:

Should the Court find that [Debtor] and Chiappetta did not enter into an enforceable oral termination agreement, then alternatively Debtor is liable for the breach of the employment agreement with Chiappetta....

**15.** Chiappetta had previously filed an action against Industries in this District Court advancing the same claim that he had asserted against Debtor in the Bankruptcy Court (*Chiappetta v. Farley Indus., Inc.,* No. 92 C 640). This Court's colleague Honorable Ann Williams has dismissed that case with leave to reinstate within 30 days of the ruling in this appeal.

whether 75,000 shares of Valley Fashions constitutes the proper embodiment of Debtor's "common equity interest" when only 100 of the shares were obtained in exchange for Debtor's original WPAC common holdings.

For his part, Chiappetta contends that he should have coming to him more than 3% of the 75,000 Valley Fashions shares held by Debtor. Chiappetta urges that the term "affiliates" in the Agreement includes not just corporate affiliates (as Judge Schmetterer has interpreted the term) but also individual affiliates as well. Thus Chiappetta argues that his Agreement with Industries entitles him to 45,000 shares—3% of the total shares (1.5 million) received by "Farley, Inc. and its officers, directors, controlling shareholders and other individual 'affiliates'" (Chiappetta Mem. 2–3).

### Debtor as Chiappetta's Target

■ At the outset it is necessary to decide whether Chiappetta is entitled to look to Debtor, either instead of or in addition to Industries, for relief if the Agreement has been breached. Debtor's position is that because Chiappetta was clearly hired by Industries, that is the only entity from which he may seek redress. Debtor points to Finding 14 that Chiappetta was employed by Industries, not Debtor ("Based on all of the above-listed facts, it is clear that Chiappetta's employer was Industries, and not [Debtor]") and Finding 11's rejection of Chiappetta's

argument that the term "Farley Industries" as used by the parties in drafting the Agreement was intended as "a generic term used to describe all the companies owned and controlled by Mr. Farley." [16]

■ But the fact that Chiappetta may have been employed by Industries does not itself foreclose Chiappetta's ability to proceed against Debtor. As Conclusion 19 explains (using "Farley" as meaning Debtor, not Farley individually):

In this case, it would work a fraud upon Chiappetta to deny him the right to recover his entitlement to Valley Fashions shares from Farley. Industries has a contractual obligation to deliver to Chiappetta 2,250 shares of common stock in Valley Fashions. However, those shares are held by Farley, and Industries has not proved to have a legal right to compel transfer of such shares from Farley to Chiappetta. Farley has refused to convey that stock to claimant. Therefore, Farley is found to hold 2,250 shares of common stock in Valley Fashions in constructive trust for Chiappetta.

In concentrating its fire on Judge Schmetterer's use of the "piercing-the-veil" label as part of the basis for imposing the constructive trust on Debtor (Conclusions 4–11, "Piercing the Corporate Veil"), Debtor misses the forest for the trees. While that rubric is not necessarily the optimal term to apply to the situation posed here,[17] the Bankruptcy

**16.** Judge Schmetterer found that the Agreement was written on Industries' letterhead (Finding 10); that Industries paid Chiappetta's salary, bonus and benefits throughout his tenure (Finding 12, citing Debtor Ex. 33–A); that he worked with Industries' employees at his job (Finding 12); that his business cards said Industries (*id.,* citing Debtor Ex. 51); that public documents produced by him for deals he worked on listed him as Executive Vice President of Industries (*id.,* citing Chiappetta Ex. 5); and finally, that during the negotiations that culminated in Chiappetta's employment Farley "explicitly" told him that he would be employed by Industries, not Debtor (Findings 16–17).

**17.** Corporate law ordinarily assures limited liability for corporate debts so that a corporation is not liable for another corporation's financial obligations, "even though the corporation is a subsidiary corporation, where the stock is wholly owned by a parent corporation and where the

parent and subsidiary have mutual dealings" (*In re Rehabilitation of Centaur Ins. Co.,* 238 Ill. App.3d 292, 299, 179 Ill.Dec. 459, 463–64, 606 N.E.2d 291, 295–96 (1st Dist.1992) (citations omitted)). Nonetheless (*Ted Harris Oil Co. v. Dokka,* 247 Ill.App.3d 791, 794–95, 187 Ill.Dec. 441, 444, 617 N.E.2d 898, 901 (4th Dist.1993) (citations omitted)):

A corporate entity will be disregarded where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of the governing or dominant personality. For a court to pierce the corporate veil (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.

Court's claimed mischaracterization of a legal doctrine provides no basis for reversal. At bottom the perception reflected in the preceding paragraph's quotation of Conclusion 19 is sound. From the outset the Agreement was framed in terms of stock that Industries would have no capacity to deliver,[18] so that Judge Schmetterer's decision that Debtor holds Chiappetta's entitlement (whatever that turns out to be) in a constructive trust cannot be faulted. More on this subject a bit later.

Thus Debtor's emphasis on certain Findings and Conclusions that suggest the absence of some formal requisites for piercing its veil does not carry the day for Debtor. Specific Findings as to the lack of evidence of Industries' undercapitalization (Finding 18), or as to any commingling of assets (Finding 3), and the asserted lack of Findings as to any unity of interests in the alter ego sense are all beside the point, when the real thrust of Judge Schmetterer's determination is the already-quoted Conclusion 19 that to spare Debtor from liability for Chiappetta's entitlements "would work a fraud on Chiappetta."

In terms of applying a legal underpinning for that Conclusion, it may be more constructive to frame that same notion in terms of Industries' contractual commitment as to Newco shares "of Farley Inc. and its affiliates" having reflected an agency relationship.[19] Under applicable agency law, the existence of apparent authority would clearly entitle Industries to serve as Debtor's agent with respect to the promise to grant Chiappetta a stock interest in any acquired corporation (*Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill.App.3d 383, 390, 160 Ill.Dec. 773, 779, 577 N.E.2d 1344, 1350 (1st Dist.1991) (corporate subsidiary may act as agent for parent corporation)). As one of the leading authorities on which *Weil, Freiburg & Thomas* relies—*Northern Trust Co. v. St. Francis Hosp.*, 168 Ill.App.3d 270, 278, 119 Ill.Dec. 37, 42, 522 N.E.2d 699, 704 (1st Dist. 1988) (citations omitted)—has summarized that doctrine:

> Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a

Accord, *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987), summarizing Illinois law. Factors to be considered in determining the degree of control one entity holds over the other include "evidence of misrepresentation; commingling of funds, assets, or identities; undercapitalization; failure to operate at arm's length; and failure to comply with corporate formalities" (*Koch, id.*, citing *Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 205–06, 56 Ill.Dec. 14, 22, 427 N.E.2d 94, 102 (1981)). Conclusions 4–11 considered those factors and decided to pierce Debtor's corporate veil, holding it liable to account for any Newco (in this instance Valley Fashions) shares that it held.

18. It makes no difference to the analysis that it turned out ex post that Industries might perhaps have potentially purchased shares of Valley Fashions for Chiappetta on the asserted (though thin) public market—represented only by two brokers at Merrill Lynch. To determine what the parties intended ex ante (at the time they entered into the Agreement), it must be recognized that by their nature complex corporate takeovers— which by definition end up with the acquiring company in control of the target—do not generate freely marketable stock in the coffers of the acquiring company. It will be remembered that the very transaction that produced the current dispute—the planned takeover of West Point- Pepperell—contemplated the acquisition of *100%* of its stock by Debtor's subsidiary WPAC (a typical such transaction). That necessarily would have required Debtor (through its subsidiary), and *not* Industries or any available market, to honor the Agreement's commitment to provide Chiappetta with 3% to 4% of that holding. It was only the fluke of the acquisition's collapse, followed by the resulting WPAC reorganization that ultimately placed Debtor in a small 5% minority position, that created the possibility of any shares available for market acquisition. Similarly, whether a future acquisition might be planned to end up with the creation of a public company was something that by definition could not be known when the parties were reaching a current understanding as to some unspecified Newco. Thus the Agreement (which could not of course have been prescient in anticipating the ultimate turn of events) must plainly be taken at its face value in promising *shares* (and not their cash value, even if ascertainable) to Chiappetta. Indeed, Farley conceded that he understood from the beginning that equity participation "was very important to Mr. Chiappetta" (Farley Tr. 866; Chiappetta Tr. 166).

19. Chiappetta made exactly that argument below. And it is of course fundamental that a reviewing court may affirm on any ground supported by the record, even if the court below has not chosen that particular route.

certain act on its behalf. The principal, having placed the agent in a situation where he may be presumed to have authority to act, is estopped as against the third party from denying the agent's apparent authority.

The doctrine of apparent authority is based on the doctrine of equitable estoppel. Both doctrines, when used to bind a principal as against a third person, are based on the same elements; there is no practical difference between them. To prove apparent agency, one must establish: (1) the principal's consent to or knowing acquiescence in the agent's exercise of authority, (2) the third party's knowledge of the facts and good-faith belief that the agent possessed such authority, and (3) the third party's reliance on the agent's apparent authority to his or her detriment.

Although the existence of an agency relationship often poses a question of fact, as to which the burden is placed on the litigant in Chiappetta's situation (*FDL Foods, Inc. v. Kokesch Trucking, Inc.*, 233 Ill.App.3d 245, 256, 174 Ill.Dec. 474, 482, 599 N.E.2d 20, 28 (2d Dist.1992)), in this instance the Findings and Conclusions call for that result as a matter of law. Each of the three elements of apparent authority is plainly and unmistakably present.

As for Debtor's "consent to or knowing acquiescence in [Industries'] exercise of authority" to commit to the delivery of Newco stock, it will be remembered that Industries is Farley's "incorporated pocketbook"—his 100%–owned Subchapter S corporation. And Farley controls Debtor as well through his 76% stock ownership. When Farley—wearing *either* hat—included in the Agreement a promise that *only* Debtor could keep (the delivery of Debtor's shares in Newco), "knowing acquiescence" by Debtor must be seen as an understatement.

And that is buttressed by the nature of the language with which the original employment agreement (Chiappetta Ex. 2) was concluded by corporate counsel Greenbaum and by Far-

ley himself (both of them, as already stated, trained as lawyers):

> Peter, you are joining Farley Industries at a unique time in our history. Our recent $500 million debt offering provides us with the opportunity to dramatically expand our business. I look forward to having you on our team and working with you.
>
> Sincerely,
>
> [signature]
>
> William Farley
>
> Chairman and Chief
>
> Executive Officer

Leaving aside Chiappetta's argument that the sort of generic use of the term "Farley Industries" that was reflected there somehow indicated the intention that his employer be Debtor and not Industries (the corporation)—an argument that Judge Schmetterer did not buy—the reference to *our* recent $500 million debt offering" unquestionably referred to Debtor (which had made that debt offering) and not to Industries alone. So it is plain from his own language that Farley was speaking of *both* companies that he headed when he included the promise for the delivery of Newco shares in causing Industries to hire Chiappetta.

As for the second requirement (Chiappetta's "knowledge of the facts and good-faith belief that the agent [in this instance Industries] possessed such authority"), that is equally beyond dispute—no discussion is really needed to demonstrate that. And of course the third required element of Chiappetta's "reliance on the agent's apparent authority to his or her detriment" is likewise without question by reason of Chiappetta's very entry into and performance under the Agreement. As *Northern Trust*, 168 Ill. App.3d at 278, 119 Ill.Dec. at 43, 522 N.E.2d at 705 says:

> The rationale for this requirement is simply that the courts developed the doctrine of estoppel[20] to prevent injustice or fraud.

That language finds its echo in Conclusion 19's determination that "[i]n this case, it would work a fraud upon Chiappetta to deny

---

**20.** [Footnote by this Court] It will be recalled that on that score *Northern Trust, id.*, 522 N.E.2d at 704 had said:

The doctrine of apparent agency is based on the doctrine of equitable estoppel.

him the right to recover his entitlement to Valley Fashions shares from [Debtor]."

And so it is that whatever may be said as to the conventional or unconventional use of the piercing-the-corporate-veil locution, the incontrovertible applicability of the doctrine of apparent authority under agency law confirms Judge Schmetterer's conclusion that to permit Debtor to hide behind corporate formalities would indeed work a fraud on Chiappetta. This Court therefore affirms the Bankruptcy Court's ruling that Debtor may be held responsible for delivering to Chiappetta his entitlement to equity participation.

■ Having said that, this Court finds it worth spending a moment to return to the alternative vehicle—that of constructive trust—that was employed by the Bankruptcy Court to reach the same destination. That concept may ordinarily be invoked to redress unjust enrichment caused by a party's wrongful conduct and is generally applicable where the plaintiff can prove either a fraud or a breach of fiduciary duty (Conclusion 18, citing *Metropulos v. Chicago Art Glass, Inc.*, 156 Ill.App.3d 727, 736, 109 Ill.Dec. 229, 235, 509 N.E.2d 1068, 1074 (2d Dist.1987)). Conclusion 18 also points out that "even where no fraud is present, courts can still impose a constructive trust when 'equity and good conscience' deem it appropriate," citing *Senese v. Climatemp, Inc.*, 222 Ill.App.3d 302, 314, 164 Ill.Dec. 236, 244, 582 N.E.2d 1180, 1188 (1st Dist.1991), which in turn cites *Selmaville Community Consol. Sch. Dist. No. 10 v. Salem Elementary Sch. Dist. No. 111*, 96 Ill. App.3d 1062, 1066, 52 Ill.Dec. 224, 227–28, 421 N.E.2d 1087, 1090–91 (5th Dist.1981).

■ Judge Schmetterer was clearly right in holding that this case is a suitable candidate for such relief. Whatever label may be

attached to the situation, the fact is that Debtor holds shares of stock that rightfully belong to Chiappetta.[21] And specific performance rather than money damages is the appropriate remedy, given the nature of the subject matter.[22] Furthermore, Class B stock, which makes up 5% of the Valley Fashions common stock, has been endowed with preferential voting rights assured to elect a third of the nine-member board, and everyone concedes that Class B shares are not among those available on the public market.[23] Under all the circumstances Judge Schmetterer's decision to grant equitable relief was clearly appropriate.

*Scope of Chiappetta's Entitlement
Equity Interest—1% or 3%?*

As the next step en route to determining the extent of Chiappetta's recovery, this Court must decide whether Judge Schmetterer was correct in finding Chiappetta entitled to the full 3% of the relevant equity participation, not merely the 1% that had undeniably vested by the time he left Industries. For that purpose it is necessary to explore a number of issues.

■ One threshold question is whether the Agreement or any later agreement of the parties as to the terms of Chiappetta's severance governs the inquiry. But any inquiry on that score is brief indeed, given the factually well-supported Conclusions 16–17 that no such later agreement was ever reached. That absence of any genuine "meeting of the minds" during the negotiations that bore on Chiappetta's then-impending departure was amply demonstrated by the two principals' nearly total difference of recollection as to what sort of oral deal was struck. Moreover,

---

**21.** Because Chiappetta's claim now under consideration is advanced solely against Debtor, this Court expresses no view as to whether the same constructive trust principles extend to the Valley Fashion shares held by Farley personally. Nor is any view expressed here as to whether Farley's relationship with Debtor is such as to cause the constructive-trust determination reached here to be issue-preclusive against Farley as well, as a party "in privity with" Debtor.

**22.** It is unnecessary to decide whether there is any basis on which the special attributes of Val-

ley Fashions' Class B shares can carry over into the hands of Chiappetta, who does not meet the description referred to in the following footnote.

**23.** Only Farley, Inc. and its employees can hold such stock because the WPAC reorganization has been structured in such a way that the preferential rights extinguish upon transfer outside of Farley's circle (Industries, West Point, and Fruit of the Loom employees), automatically converting the shares to regular Class A (Greenbaum Tr. 579–80).

the parties failed to reduce any agreement to writing and sign it, as might have been expected based on their prior course of dealing, thus further bolstering the conclusion that no severance agreement was in place resolving Chiappetta's rights and obligations.[24]

In those circumstances Judge Schmetterer properly found that the Agreement remained in place until Debtor breached it by terminating Chiappetta's salary and benefits in August 1990. In an effort to escape that finding and its inevitable consequences, Debtor offers up four contentions:

1. Chiappetta quit his job voluntarily, thus extinguishing his prospective vesting rights.

2. If Chiappetta did not quit, he was terminated for cause—thus cutting off any further vesting of his equity interest in Valley Fashions.

3. If *that* were not the case, the Agreement was mutually rescinded after March 1990.

4. And even were *that* not the case, the Agreement is not enforceable because it is not a "mutual bilateral agreement."

Analysis confirms that none of those successive rear guard attacks on the Bankruptcy Court's Conclusions is at all persuasive.

▆▆▆ As to the first contention, Debtor Mem. 29 asserts:

The uncontroverted evidence establishes that Chiappetta voluntarily agreed to terminate his employment in March, 1990....

But Finding 51 explains that "the occasion for his departure was the failure of Cion and Mr. Farley to find meaningful work for Chiappetta in his new position as subordinate to Cion." [25]

Indeed, Debtor's voluntary-quit argument is particularly disturbing in light of its repeated insistence to the contrary before Judge Schmetterer—its statements in a number of different ways that Chiappetta was "fired for cause": see, among other things, Greenbaum Tr. 545 ("My understanding was that Mr. Chiappetta was terminated for cause at the beginning of 1990"); O'Hara Tr. 936–37 ("[Farley] directed me to ... implement the termination"); Debtor's counsel Bonita Stone's unequivocal statements at Tr. 119 [26] and 695 [27]; Debtor Ex. 34 (handwritten memo from Susan Vander Horn stating "... terminate and stop pay for Peter Chiappetta effective 6/30/90. Then COBRA.... No Severance"); Debtor Ex. 36 (Industries Employee Change of Status form dated "8/9/90," with Chiappetta's name at the top, stating "Terminate per Paul O'Hara").

In light of that constant repetition below of Debtor's Chiappetta-was-terminated-for-cause position, a contention that was unambiguously proffered by its counsel as well as set out in its own documents and sworn testimony, Debtor's "new and improved" voluntary-quit version is remarkably disingenuous. Even apart from a serious "mend the

24. It is doubtful that the parties even reached an "agreement to agree"—and if they had it would not have done the job anyway (*Scott v. Assurance Co. of Am.*, 253 Ill.App.3d 813, 821, 192 Ill.Dec. 479, 485, 625 N.E.2d 439, 445 (Ill.App. 4th Dist. 1993) ("An agreement to agree in the future is not an agreement")).

25. Next Findings 52–56 set out how that situation led to a Farley–Chiappetta meeting in March 1990 that looked to Chiappetta's possible departure, but show that the meeting led to the failure of mutual understanding (save on the single issue of Net Portfolio Profits) that has already been mentioned here. And Finding 56 finishes with this determination:

In any event, since there was no meeting of the minds on all points, and since Chiappetta was not fired for cause, the Court must find that he did not voluntarily quit in March of 1990. Rather, he was fired without cause on August

31, 1990, when his salary and benefits were cut off over his protest.

Every one of those findings is solidly grounded in plausible evidence, and for a court of review (the posture that this Court occupies here) that really ends the matter.

26. THE COURT: You are claiming, are you not, that Mr. Chiappetta was terminated for cause?
MS. STONE: Yes.
THE COURT: Or are you claiming he resigned?
MS. STONE: We are claiming he was terminated for cause.
THE COURT: Are you claiming the evidence will show that someone asked him to leave?
MS. STONE: Yes. Mr. Farley.
THE COURT: Personally?
MS. STONE: Yes, personally.

27. MS. STONE: Your Honor, we're going [to] stipulate that Mr. Chiappetta was terminated in March of 1990.

hold" problem,[28] the earlier argument essentially constitutes a fatal and decisive admission that Chiappetta did not walk away from the job voluntarily. Though this added fillip is not essential to support Judge Schmetterer's unexceptionable finding, it bears mention because it is a distressing litigation tactic.

■ With the threshold voluntary-quit contention having been scotched, Debtor's next argument against full vesting is that Chiappetta was terminated for cause at a time that he was entitled to only 1% (not 3%) of the relevant equity interest. Like so many other aspects of the Agreement, "cause" is not defined, nor does it appear that the parties discussed its meaning (Finding 41). In construing the term, Judge Schmetterer rejected both extremes—either a highly restrictive conception (matters such as theft or other illegal or immoral activity) or an essentially standardless one (termination at Farley's whim) (Finding 42). Instead Finding 44 determined:

> [I]t is reasonable to find that "cause" for discharge included incompetence and inability to effectuate [Debtor's] acquisition plans. Any demonstrated inability on the part of Chiappetta to negotiate effectively and deal with the acquisition financiers and other parties to the intended acquisition could constitute "cause" under his employment agreement.

Under that standard Judge Schmetterer held flatly that no cause had been shown to support Chiappetta's discharge (Finding 47) *and*, perhaps even more critically (Findings 48 and 53):

Mr. Farley testified that his executives lost faith in Chiappetta's ability to close the West Point acquisition successfully. However, whether or not this loss of confidence occurred, the evidence shows that Chiappetta's employment was not terminated for this reason or for any other "cause."

\* \* \* \* \* \*

Mr. Farley is a bright and articulate individual who was certainly capable of expressing to someone that they were being fired for cause. However, Mr. Farley never told Chiappetta that he was being fired. At the March 1990 meeting, he agreed that things were not working out, and that Chiappetta would leave Industries. However, Mr. Farley did not complain that there was cause to discharge him, and did not discharge him at that meeting.

There is no way in which those Findings can be overturned as "clearly erroneous"—on the contrary, they are more than amply supported by the evidence. And as with other already-discussed Findings, they are further supported (though no further support is really needed) by other corroborative evidence— in this instance, for example, Judge Schmetterer has more than reasonably credited Chiappetta's testimony as to the $50,000 raise in salary that he received[29] and as to the $375,000 first-year bonus awarded by Farley on May 5, 1989, a full $275,000 more than the guaranteed $100,000 minimum stated in the Agreement (Chiappetta Tr. 208–09). Farley's testimony that attempts to explain away that large added payment as somehow consistent with his claimed displeasure with Chiappetta's performance is lame indeed (Farley Tr. 871–73).[30]

---

**28.** *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir.1990) (discussing evolution and operation of "mend the hold" doctrine in Illinois); *Camelot Care Centers, Inc. v. Planters Lifesavers Co.*, 836 F.Supp. 545, 554 & n. 15 (N.D.Ill 1993) and cases cited there (established doctrine forbids a defendant to "mend its hold," foreclosing defendant's recourse to belated new grounds). In many ways, Debtor presents a particularly insidious breach of the "mend the hold" doctrine because it seeks not just to change the focus of the story that it told at trial, but instead to conduct an absolute 180-degree about-face, completely *contradicting* its own previous version.

**29.** In so finding, Judge Schmetterer quite understandably discounted Farley's implausible testimony that the raise was granted to improve morale and "not based on whether or not he deserved it" (Farley Tr. 786–87) and accepted Chiappetta's explanation that Farley increased his salary because "he thought I was doing an excellent job" (Chiappetta Tr. 210).

**30.** Chiappetta had testified that there had been an oral agreement for the much larger bonus payment from the beginning. Farley not only did not confirm that, but in his pretrial deposition he had airily offered a set of possible reasons that reflect adversely on his credibility (Farley Tr.

■ With Debtor thus having failed to establish either of its first two contentions, this opinion turns to Debtor's alternative argument that the Agreement was mutually rescinded at the March 1990 meeting (after which Chiappetta no longer performed work for Industries). But that is not the way that Debtor framed the issue before Judge Schmetterer—there the thrust of its position was rather that the Agreement had been "replaced," "superseded" or "extinguished" by the asserted severance agreement.[31]

Debtor's Bankruptcy Court position necessarily fails because of Judge Schmetterer's already-discussed (and amply supported) determination that there had been no meeting of the minds that could properly be characterized as a severance "agreement" (Finding 56). In an effort to escape that defeat, Debtor now attempts to recast its argument: It urges that despite the failure of Farley and Chiappetta to reach a superseding severance agreement, the later conduct of the two men nonetheless demonstrated their mutual assent to the rescission of the Agreement (Debtor Mem. 36–38).

■ It does not appear to have occurred to Debtor that this Court's posture vis-a-vis the Bankruptcy Court in this case is equivalent to that of a Court of Appeals reviewing a District Court judgment: No argument that was not made below can be entertained on this appeal. Mutual rescission of the Agreement was never urged in those terms to Judge Schmetterer, and that alone would

justify the rejection of that argument here on waiver grounds. But even were that not so—even if the rescission contention were somehow capable of being reconstructed as a permutation of the failed novation argument—Debtor could still not overcome Judge Schmetterer's overriding determination that the Agreement remained in effect at all times until it was breached when Farley cut off Chiappetta's salary benefits. Because Judge Schmetterer held (with good reason, as already discussed) that the Agreement continued to govern the parties' relationship, that holding necessarily encompasses the rejection of any argument that the Agreement had previously been rescinded.[32]

Only one potential basis therefore remains for applying a 1%, rather than 3%, vesting calculation to Chiappetta's equity participation under the Agreement: Debtor's current fourth argument (its Mem. 38–40) that after Chiappetta left Industries, the Agreement was somehow no longer a "mutual bilateral agreement" because Chiappetta's right to contractual entitlements was "dependent on his performance of his obligations under the agreement." Again that urges a position on this appeal that was not proffered below—and as before that alone is enough to call for its rejection. But even were that not the case, once again the contention fails on the merits because of Judge Schmetterer's (correct) finding that the Agreement remained in force until it was breached by

873). Though Judge Schmetterer sustained Ms. Stone's objection to introducing that earlier testimony on the ground that it was "not proper impeachment" (Tr. 873), that appears erroneous—Farley's earlier sworn statement would seem to be independently admissible under Fed. R.Evid. 801(d)(2)(D).

**31.** Here is what Debtor's Bankruptcy Court Trial Brief at 19–20 (citation omitted) had to say on the subject:

[I]f the Court finds that Debtor can be held liable for [Industries'] contractual obligations[,] ... it must look to the terms of Chiappetta's Severance Agreement to determine what rights, if any, Chiappetta has against Debtor, because the Severance Agreement, being a novation, superseded the Employment Agreement. The creation of the Severance Agreement was a novation because: (1)

the August 4, 1988 agreement was a previous, valid obligation between the parties; (2) the parties agreed to a new contract, the Severance Agreement; (3) the Severance Agreement extinguished the August 4, 1988 Employment Agreement; and (4) the Severance Agreement was a valid contract. Thus the novation rendered the Severance Agreement the only contract upon which Chiappetta may sue.

**32.** Even apart from this Court's obligation to uphold the Bankruptcy Court's factual determinations because they cannot be characterized as clearly erroneous, it is independently obvious that the notion of Chiappetta's joinder in a mutual rescission at the March 1990 meeting is inherently improbable. Chiappetta correctly points out that it strains credulity to suggest that he would voluntarily and knowingly desert his rights to hundreds of thousands of dollars in income while receiving nothing in exchange.

Debtor.[33]

*Equity Interest—How Many Shares?*

■ What has been said to this point confirms Chiappetta's contractual entitlement to his promised 3% "of Farley Inc. and its affiliates' common equity interest in Newco." What remains is to determine the base—the number of shares of Valley Fashions—to which that 3% figure applies.

Although both the Bankruptcy Court and the parties have devoted the bulk of their discussion in that respect to the task of defining the scope of the term "affiliates," a material part of the determination does not hinge on that question at all. It will be recalled that the Bankruptcy Court, based solely on its reading of "affiliates," held that Chiappetta was entitled to 3% only of the 75,000 shares distributed to debtor (a total of 2,250 shares), thus rejecting Chiappetta's claim to 45,000 shares—that is, to 3% of the entire 1.5 million shares that were received by Debtor, by Farley and by the various other individuals in their capacity as Debtor's executives.[34]

But even if the term "affiliates" were to be given a limited reading, Judge Schmetterer's conclusion in that respect has unfortunately missed the logical thrust of his own Findings. Here was a promise really made by Debtor (which was 76% owned by Farley), acting through Industries (which was 100% owned by Farley, with all of its tax consequences flowing directly through to Farley because of its Subchapter S status), to turn over at least 3% of its equity in any acquired corporation to Chiappetta. And Farley was not only the President and Chief Executive Officer but also the sole director of the acquired Valley Fashions (Chiappetta Ex. 14 at 88).

In that scenario Farley, who was the dominant figure at every level of the transaction, and whose 76% position in Debtor would have given him $.76 of every dollar's worth of Debtor's equity position in Valley Fashions in all events, involved himself in an allocation of that position that vested him personally with 47% of the Valley Fashion shares. This opinion need not address, let alone hold, that such allocation involved some problematic question of self-dealing in Farley's enhancement of his own position.[35] What *is* critical is that in a contract where Chiappetta's equity entitlement was (to give Debtor the benefit of every doubt) a direct function of the exercise of discretionary judgment on the part of Farley and Debtor, familiar principles of Illinois law are called into play in Chiappetta's favor.

It has long been recognized by the Illinois courts that *every* contract implies good faith and fair dealing between the contracting parties (see *Martindell v. Lake Shore Nat'l Bank*, 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958) and its numerous progeny). *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443–44 (7th Cir.1992) has reviewed that universally applied covenant at some length, drawing (*id.* at 1443) upon *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 991, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1st Dist.1984) to state:

> In its discussion of the implied good faith and fair dealing doctrine, the court relied on a series of Illinois cases where the contractual obligation of one party was contingent upon a condition peculiarly within the power of that party. The court noted that in such cases, the implied covenant of good faith limits the controlling party's discretion and the controlling party

**33.** Moreover, the mutuality-of-obligation approach simply does not fit the present situation, where Judge Schmetterer found against Debtor on the termination-for-cause issue. Debtor cannot bootstrap its wrongful termination of Chiappetta into an equally wrongful diminution of Chiappetta's entitlement that he had earned by reason of his having "participated" in the West Point–Pepperell acquisition (a matter on which there is no dispute, see Jt. ¶ 26).

**34.** Chiappetta Mem. 8 n. 7 says that he filed a motion to compel Debtor to produce a comprehensive list detailing which executives received

how much stock. When Debtor resisted that motion on the grounds of relevance, Judge Schmetterer denied the motion.

**35.** *Veco Corp. v. Babcock*, 243 Ill.App.3d 153, 160, 183 Ill.Dec. 406, 411, 611 N.E.2d 1054, 1059 (1st Dist.1993) is a recent example of a host of cases stating the long-established principle that corporate officers' "fiduciary duty of loyalty to their corporate employer" includes the obligation "not to ... actively exploit their positions within the corporation for their own personal benefit."

"must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."

Accord, such cases as *Pierce v. MacNeal Memorial Hosp. Ass'n*, 46 Ill.App.3d 42, 48–51, 4 Ill.Dec. 615, 620–22, 360 N.E.2d 551, 556–58 (1st Dist.1977) and *Foster Enter., Inc. v. Germania Fed. Sav. & Loan Ass'n*, 97 Ill.App.3d 22, 28–30, 52 Ill.Dec. 303, 308–09, 421 N.E.2d 1375, 1380–81 (3d Dist.1981).

As applied to this case, that doctrine clearly teaches that the decision to shunt 705,000 of the 1.5 million Valley Fashion shares to Farley (who did not pay for those shares in dollars, but assertedly received them as some kind of incentive for future activity) cannot serve as a vehicle for diminishing the "reasonable expectations" of Chiappetta. That is underscored by Chiappetta's later-referred-to testimony—which was left uncontradicted by Farley and was not disavowed by the Bankruptcy Court—as to the example that Farley had given Chiappetta about how the 3% formula would apply at the time they were first negotiating their deal.[36] Without reference to the scope of the "affiliates" definition, then, the base to which the 3% formula applies certainly includes Debtor's 705,000 shares that it then allocated to Farley individually as well as the 75,000 shares it kept for itself.

At a minimum, then, Chiappetta's entitlement embraces 3% of 780,000 shares of Valley Fashions—23,400 shares. And because (as already stated) Industries acted as Debtor's agent in making that commitment, the decision below fell short of the mark at least to that extent in defining the amount of Debtor's liability to deliver such shares. But no final decision can be reached here as to the decision's total shortfall because of the need also to resolve the Agreement's concept

of "affiliates"—the final subject to which this opinion now turns.

■■■ This is the one area in which the Findings and Conclusions are extraordinarily puzzling. There was a deep conflict between the parties' versions of the manner in which the provision for including the shares of "affiliates" found its way into the Agreement, as well as between their versions of the discussions that bear on the meaning of that term. Yet the Findings did not purport to resolve that conflict—indeed, Judge Schmetterer immediately preceded the numbered Findings with a paragraph that began:

> The evidence in this case was to some degree contradictory and does not fall into neat and unequivocal findings. Moreover, the Court could not find that any of the witnesses with contrary recollections lacked credibility.

And to the extent that Judge Schmetterer *did* deal with the evidence in this area, it represents the only aspect of the case on which the Findings were clearly erroneous—and hence on which the dependent Conclusions were wrong as a matter of law.

Look first at the unresolved conflict. Debtor's attorney Greenbaum testified that he was the one who added "affiliates" to the Agreement in the process of reducing to writing what he believed to be the parties' understanding that the term would have a narrow scope—only corporate affiliates, but not insiders such as directors and officers (Greenbaum Tr. 575). Chiappetta swore to exactly the opposite: that *he* was the one who chose the term and that at the time Greenbaum expressed his own understanding that it was to encompass "companies, people, subsidiaries, divisions that are related to or connected with Bill Farley" (Chiappetta Tr. 182 [37]). And Chiappetta elaborated on that testimony in a respect critical to the current inquiry—he said that during the course of his

---

**36.** It is not, however, essential to subscribe to that piece of evidence to reach the result stated here.

**37.** In a remarkable example of trying to have matters both ways, Debtor Mem. 20 in response to Chiappetta's appeal asks this Court to credit the first part of Chiappetta's testimony as to his having caused the reference to "affiliates" to be

placed in the Agreement (so that the principle of contra proferentem would cause "affiliates" to be construed adversely to Chiappetta), while at the same time Debtor wants this Court to discredit the rest of that testimony (which would give substantive content to the parties' discussion about the expansive meaning of "affiliates").

negotiation with Farley the latter *specifically* pointed to [Debtor's] acquisition of Northwest Industries, and the result—the creation of the public company, Fruit of the Loom" as an example of how the formula for Chiappetta's equity participation would apply (Chiappetta Tr. 167–68). And after Farley had told Chiappetta that in that acquisition "Farley and his affiliates, *including management*," had ended up with some 35% of the outstanding shares (*id.* at 168, 170), Chiappetta testified that Farley had told him that Chiappetta's 3% to 4% "equity participation in the final acquisition ... would come out of the component that would be retained or concluded in the component of *management and affiliates* similar to what had happened in the Northwest Industries Fruit of the Loom transactions" (*id.* at 170).

For his part, Farley (with a good deal of leading by Debtor's counsel) confirmed that Chiappetta was being offered a "potential equity interest in some future deal whereby Farley Inc. made an investment in a new company" (Farley Tr. 738) and disclaimed that Chiappetta was being offered "a 3 percent equity participation in Farley Inc. directors' ownership interest in Newco" (*id.* at 739)—which Farley labeled as "sort of almost absurd" (*id.*). But Farley did *not* disclaim the just-recounted conversation that Chiappetta testified to in detail, and of course the question whether the *measure* of what Chiappetta was entitled to receive out of *Debtor's* total investment was to include shares that Debtor caused to be issued to officers and directors is quite different from the question whether Chiappetta would have the right to receive a piece of the *individuals'* own investments. And equally of course, Greenbaum's testimony that he did not discuss the term "affiliates" in the Agreement with Chiappetta (Greenbaum Tr. 502, 621)—though at odds with Chiappetta's version of

their conversation—cannot bear on the content of the earlier Farley–Chiappetta meeting in which he did not participate.

Resolution of such conflicts is of course the province of the trial court, not of a court of review. All the same, it strains credulity to observe two legally trained persons (Farley and Greenbaum) who are active in the sophisticated world of public corporations, leveraged corporate takeovers and the like, yet who disclaim awareness of a basic concept that has long been familiar to anyone with even a modicum of contact with the securities laws: that the concept of a corporation's "affiliates" embraces any "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" that corporation (*Northway, Inc. v. TSC Indus., Inc.*, 512 F.2d 324, 332 n. 14 (7th Cir. 1975), quoting the familiar definition in SEC Rule 12b–2(a)).[38]

In light of everything that has been said up to this point, the treatment of the "affiliates" issue below is plainly wanting. Finding 26 would have it that the meaning to be accorded "affiliates" was not discussed or clarified at the time the parties contracted.[39] That seems to discredit Chiappetta's testimony to the contrary, but the Findings say nothing to that effect—they do not advert to, even by way of rejection, Chiappetta's express testimony (already set out here) about his discussions with Greenbaum *and* with Farley. Instead Findings 26–30 go off the tracks as a result of a patent misunderstanding of Chiappetta's position—a perception that he was claiming more than a 100% recovery of his 3% share in the acquired equity. That misapprehension contributed directly to the holding in Finding 28 that "affiliates" meant only corporate affiliates and that "the parties clearly intended that Chiap-

---

**38.** In a way Farley's testimony calls for an even sharper look than Greenbaum's. Not only did Farley profess to be without recollection in this *entire important area of the case* (he portrayed himself as a tabula rasa), but this opinion has already referred to his dubious testimony about the reasons for his large uncompelled bonus payment *to Chiappetta—hardly something to instill* confidence in his credibility.

**39.** Finding 31 speculated that defining terms with any degree of precision would have obligated the parties—who were at the time rosy about the prospects of their own affiliation—to confront potentially ugly possibilities. For all the knocks that lawyers take these days, if the parties had been represented by counsel at all stages of their negotiations, perhaps the controversy could have been minimized or even avoided (Finding 56).

petta only receive a percentage of what Farley acquired, not a percentage of shares distributed to any of its executives."

Debtor was able to convince the court below that if "affiliates" were found to encompass not just corporate affiliates but also its normal securities law meaning of individual affiliates as well, Chiappetta would get 3% of the total amount of shares accruing to Debtor in addition to *another* 3% of the sub-pot of those same shares that were then subsequently distributed to individual officers.[40] But that is not at all the case. Instead Chiappetta's position is the simple (and internally logical) one that where Debtor's acquisition of Newco entailed the rights to 1,000 shares (to stay with Finding 27's example), Chiappetta's 3% participation would apply to that figure *before* rather than *after* Debtor chose to share that largesse with its insiders or other officers.

That same misunderstanding on Judge Schmetterer's part led to Finding 28's erroneous highlighting of Chiappetta's awareness when he signed the Agreement of "Farley's practice of distributing stock in acquired companies to the corporate officers of Farley and/or Industries as part of their compensation packages." Chiappetta's testimony as to that awareness must be read in the context of the express example that he said Farley gave him during their negotiations, under which Chiappetta's 3% share would apply to *all* of the acquired stock *including* the portion parceled out to officers. Chiappetta's stated understanding was clearly that his entitlement was to share in the entire pot *with* all of those officers, not to pick up a share of the leavings after everyone else had been taken care of (a drastically watered-down if not wholly illusory promise, as this case illustrates so graphically [41]).

And so it must be concluded that the "affiliates" issue must be revisited by the Bankruptcy Court in light of all the evidence—properly understood—on that score. In light of the directly conflicting testimony on the subject, it is for the trier of fact to cut the Gordian knot of credibility.[42] Only in those terms can the decision below "give effect to the reasonable expectations of the parties" (Conclusion 13, quoting *Lowrance v. Hacker*, 888 F.2d 49, 51 (7th Cir.1989)). That necessitates a remand to see whether or not Chiappetta's base for the 3% calculation extends to the remainder of the 1.5 million Valley Fashions shares (over and above Debtor's 75,000 retained shares and controlling shareholder Farley's 705,000–share allocation).

### Conclusion

To the extent challenged by Debtor's appeal, the decision of the Bankruptcy Court is affirmed. As for Chiappetta's appeal, the Bankruptcy Court's determination is reversed in that Chiappetta is entitled to at least 23,400 rather than just 2,250 of Debtor's Valley Fashions' common shares, but the case is remanded for a further determination as to Chiappetta's possible entitlement to additional shares depending on the meaning of the term "affiliates." Because of that need for a fresh look by the Bankruptcy Court, this is not a final decision on the parties' respective rights and obligations.

40. Finding 27 gives the mistaken illustration that where a corporation having 1,000 shares outstanding was acquired by Debtor and 100 of those were distributed to Farley personally, Chiappetta's claim would purportedly entitle him to 33 shares (3% of 1,000 *plus* 3% of 100) instead of a straight 30 shares.

41. What has been said here is underscored by the opportunity for self-dealing to Farley's own benefit and to Chiappetta's detriment that is created by Judge Schmetterer's misreading of Chi-

appetta's testimony, but that is avoided by a full understanding of what Chiappetta testified to.

42. What has been quoted earlier from the beginning of the Findings ("the Court could not find that any of the witnesses with contrary recollections lacked credibility") is somewhat reminiscent of the old saw about the politician who, questioned as to his views on a highly controversial issue, said:

Some of my friends are for it and some of my friends are against it—and I'm for my friends.